No. 46,651

Fairlawn Plaza Development, Inc., *Appellant,* v. The Fleming Co., Inc., *Appellee.*

(502 P. 2d 663)

Opinion filed November 4, 1972.

*Robert R. Irwin,* of Irwin, Irwin & Schowengerdt, of Topeka, argued the cause and was on the brief for the appellant.

*Terry Bullock,* of Cosgrove, Webb & Oman, of Topeka, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

KAUL, J.: This is an action for a declaratory judgment to construe the terms of a shopping center "Build and Lease Agreement." The lease provides for payment of rents based on a percentage of gross sales of the lessee's supermarket if the percentage amounts to a sum greater than the minimum fixed cash rent agreed upon.

Defendant's sublessee operates a bakery on the premises. The question in the case is whether the portion of the baked goods sold or transferred to affiliated stores of the sublessee are to be included in the term "gross sale" as defined in the lease.

Plaintiff-lessor appeals from a summary judgment rendered for defendant-lessee.

Both parties filed motions for summary judgment, at which time the trial court had before it the pleadings, affidavits and exhibits from which the facts are gleaned.

The build and lease agreement was executed on September 20, 1960. It declared that:

". . . [T]he LESSOR desires to construct a building and surrounding area as a part of the FAIRLAWN PLAZA SHOPPING CENTER, said building to be located as approved by the parties thereto . . . and the LESSEE desires to lease said building and surrounding area for the operation of a retail food supermarket."

Section 2 of the lease agreement reads:

"The LESSOR agrees to cause construction of a building containing approximately 18,561 square feet, together with a parking area and a service area (said building, parking area and service area herein together called the premises), all to be carried on in accordance with the *attached plans and specifications.*

"This lease shall not become effective until both parties have *approved the plans and specifications* and have initialed and attached hereto a copy thereof. The LESSOR agrees that at the option of the LESSEE this lease shall become null and void if construction of the premises is not begun on or before December 1, 1960, and if thereafter construction is not completed with all reasonable diligence." (Emphasis supplied.)

The agreement further provides for a lease term of fifteen years with an option granted to lessee to extend the lease for three additional periods of five years.

Provisions concerning the amount of rent and the payment thereof appear in Section 5 of the lease agreement. In substance it was agreed that lessee should pay an annual rent of $26,727.84 in

monthly payments of $2,227.32, or one and one-quarter percent of all gross sales, as defined, in any one calendar month, whichever is greater. This section of the lease was amended by a supplement to the lease executed on July 12, 1965. The supplement provides for an annual fixed rent of $15,000.00, instead of $26,727.84, until lessor had completed construction of an additional 80,000 square feet of building area in the shopping center. After completion of the additional construction the rent provisions originally agreed upon were to become effective.

The portion of the lease agreement which gives rise to the dispute between the parties is the definition of "gross sales" which appears in Section 5 as follows:

"The term 'gross sales' as used herein shall include all sales of merchandise from, through, or out of the leased premises, including performance of any service for any customer or patron for compensation by the LESSEE, or by any salesman, saleswoman, or employee, and shall include all sales by every portion and department thereof, and sale by any sublessee, concessionaire, or licensee in said premises for cash or on a charge basis, paid or unpaid, collected or uncollected, and including all business in which orders come by mail, telephone or telegraph, and all business where goods are delivered directly by the supplier to the purchaser (whether or not actually handled by the LESSEE), less credit for returned merchandise, merchandise trade-ins, and credits of a similar nature; and 'gross sales' shall not include sales tax. *Transfers of merchandise between stores of sub-lessees are not Gross Sales."* (Emphasis supplied.)

The remainder of the lease agreement deals with insurance responsibility, additions, alterations, damage to the premises, and other matters not pertinent to the dispute in litigation.

Plaintiff-lessor, as agreed, proceeded to construct the building according to plans and specifications attached. The building encompassed a total of 18,561 square feet of which 2,214 square feet was devoted to a bakery operation.

Three days after the execution of the "Build and Lease Agreement," on September 23, 1960, the defendant subleased the premises to Ernest R. Dibble; Paul L. Dibble, and John W. Dibble. On April 3, 1968, the original sublessees assigned all of their interests as sublessees to Dibble Fairlawn, Inc. John W. Dibble is the sole owner of all of the outstanding capital stock of Dibble's Fairlawn, Inc. Since the commencement of the terms of the lease between plaintiff and defendant, the sublessee has operated a retail grocery supermarket on the premises and during such time there were three other Dibble stores which were at all times, following the

commencement of the lease term, affiliates and operated in conjunction with the store operated by the sublessee.

Since the commencement of the lease term the sublessee has operated a bakery on the premises in question, and part of the products of the bakery has been delivered to the three affiliated stores and sold at retail therein.

After the lease agreement had been in effect for about six years, plaintiff says it discovered that defendant had not included in gross sales the bakery products delivered to the three affiliated stores. Defendant took the position that the furnishing of bakery goods from the Dibble's Fairlawn Plaza store to the other Dibble stores did not fall within "gross sales" as used and defined in the "Build and Lease Agreement." Whereupon plaintiff filed this declaratory judgment action praying:

". . . that the Court interpret and construe the Build and Lease Agreement and the Supplement thereto. . . ."

The trial court held that the bakery operation was excluded under the lease provisions defining "gross sales" because it is a transfer of merchandise between the stores of the sublessee.

On appeal both parties take the position that there are no ambiguities in the lease if the language used therein is given its ordinary meaning. Nevertheless, both parties supply us with citations of the various rules of construction which would be applicable if we were to find ambiguity in our examination of the lease on appeal.

Testing the lease provisions in question, by giving the language used its ordinary meaning, we do not believe the words used can genuinely be understood to have two different meanings. Thus, under familiar applicable rules, ambiguity does not exist. (*Stewart v. Preferred Fire Ins. Co.*, 206 Kan. 247, 477 P. 2d 966; *Wood v. Hatcher*, 199 Kan. 238, 428 P. 2d 799; and *Simonich, Executrix v. Wilt*, 197 Kan. 417, 417 P. 2d 139.) It follows that the meaning of the provisions in question must be determined by the contents of the lease agreement alone, and words cannot be written into it which import an intent wholly unexpressed when it was executed. (*Williams v. Safeway Stores, Inc.*, 198 Kan. 331, 424 P. 2d 541; and *Wood v. Hatcher*, supra.)

In its first and principal point of error on appeal, plaintiff contends the summary judgment of the trial court was erroneous because the bakery goods produced and processed in the leased facility and sold to other Dibble stores constituted wholesale sales subject to

the rental based on percentage of gross sales and were not transfers of merchandise. Plaintiff argues that the furnishing of bakery products to the other Dibble stores constituted a sale of merchandise from or out of the leased premises or the performance of a service for compensation.

Defendant, lessee, on the other hand, argues that an examination of the language used in Section 5 reveals that the parties contemplated that gross sales were to include sales for profit to customers or patrons, or sales arranged by the retailer for its profit and delivered directly by a supplier to an ultimate purchaser. Defendant contends that a sale or transfer to an affiliate store cannot be considered a sale for profit to a customer, patron, or purchaser within the context or the term "gross sales" as defined, and, further, that the last sentence of Section 5, "Transfers of merchandise between stores of sub-lessees are not Gross Sales," clinches this interpretation of Section 5.

We are constrained to agree with the interpretation adopted by defendant and the trial court. We believe the parties, by the language used, contemplated sales to customers or patrons as distinguished from sales or transfers to affiliate stores, and it is of no moment whether the transfer of the baked goods in question be considered a sale or a transfer to the affiliate.

In support of its motion for summary judgment, plaintiff attached the affidavit of Chas. A. Bennett, president and managing officer of plaintiff. In his affidavit Mr. Bennett states:

". . . [H]e has been informed and therefore believes that the sale of 'bakery goods' processed by Dibble's Fairlawn, Inc., and sold to other 'Dibble' retail supermarkets were sold to such other outlets at the retail price less twenty-five (25%) percent."

When a motion for summary judgment is submitted to the court for consideration, the movant's adversary is entitled to the benefit of all reasonable inferences that may be drawn from the facts under consideration. (*Rothwell v. Transmeier*, 206 Kan. 199, 477 P. 2d 960.) So, because of Mr. Bennett's affidavit, we shall treat the bakery transaction between the sublessee and affiliate stores as a sale, which, we assume, was the treatment given by the trial court.

For purposes of summary judgment, defendant concedes the Bennett statement stands admitted and that the transaction must be considered a sale, but contends this makes no difference because "transfer of merchandise" includes "sale of merchandise."

Despite an unchallenged statement of the trial court that the parties agreed, when the motions for summary judgment were submitted, that there was no factual dispute, plaintiff now argues that since Mr. Bennett termed the transaction between stores of sublessee a "sale" rather than a "transfer," a dispute of fact exists. We cannot agree. In common usage of the term "sale" is included in the broader term "transfer." A pertinent statement, in this regard, appears in 77 C. J. S., Sales, § 2, p. 583:

"While in its broadest sense, the term 'sale' comprehends any transfer of personal property from one person to another for a valuable consideration, the words 'sale' and 'transfer' are not synonymous. The word 'transfer' is more comprehensive than the word 'sale,' and may involve a mode of disposing and parting with property other than by sale. . . ."

In Volume 3 Words & Phrases (Fourth Series), Sales, p. 429 this appears:

"A 'sale' is ordinarily understood to mean a transfer of property for money. Mifflin v. Shiki, 293 P. 1, 3, 77 Utah. 190."

In Webster's Third New International Dictionary (unabridged), at page 2003, sale is defined:

". . . the act of selling : a contract transferring the absolute or general ownership of property from one person or corporate body to another for a price. . . ."

While transfer is defined:

". . . the conveyance of right, title, or interest in either real or personal property from one person to another by sale, gift, or other process. . . ." (p. 2427.)

The broad denotation of the word "transfer" is noted both by case law and statute in this state. The meaning of the words "assignment" and "transfer" were considered in *Elwood v. Soldiers' Compensation Board,* 117 Kan. 753, 232 Pac. 1049, wherein the word assignment was said to have a comprehensive meaning—the opinion continues:

". . . The word 'transfer' has a still wider meaning. It includes all translations [transactions] whereby property of one person becomes the property of another, whether by descent or purchase, and a will is the common assurance of a transfer which becomes effective at the death of the testator. . . ." (p. 754.)

We find no general statutory definition of the word "transfer." However, with respect to taxation of legacies, successions and estates, K. S. A. 79-1528 (2) reads:

"The word, 'transfer' shall be taken to include the passing of property or any

interest therein in possession or enjoyment, present or future, by inheritance, descent, devise, succession, bequest, grant, deed, bargain, sale, gift or appointment in the manner herein prescribed."

Obviously, in common usage the word "transfer" includes "sale"—while transfer includes conveyance of property other than by sale, there is no circumstance wherein a sale would not be a transfer. It appears the broad terms "transfer" and "merchandise" were used to express the intent of the parties to exclude from gross sales any transfer of any merchandise between stores whether it be by trade, exchange, sale or however. An express covenant in a lease on a given subject matter excludes the possibility of an implied covenant of a different or conflicting nature. (*Williams v. Safeway Stores, Inc.*, supra.) If the parties intended to give the word "transfer" other than its ordinary meaning it would have been a simple matter to do so in the lease agreement. We cannot make an agreement for the parties which they did not make for themselves. (*Borgen v. Wiglesworth*, 189 Kan. 261, 369 P. 2d 360; and *Smith v. Holmes*, 181 Kan. 438, 312 P. 2d 228.) When language used is clear and unambiguous, the intention of the parties and the meaning of a contract are to be deduced from the content of the instrument alone. (*Williams v. Safeway Stores, Inc.*, supra.)

Plaintiff argues that, under the trial court's interpretation of the lease, the defendant and its sublessee could change the entire operation from one of a retail supermarket to a wholesale bakery for its other stores and thus escape the percentage rents based on gross sales from the premises. Plaintiff is fully protected from any such happening. The instrument in question here is more than just a lease. It is a build and lease agreement for the declared purpose of constructing a building for use as a retail food supermarket in accordance with attached plans and specifications, which included 2,214 square feet of bakery space. Any attempt by a lessee or sublessee to convert the premises for a use other than a retail food supermarket, or to enlarge the bakery operation beyond that contemplated by the plans and specifications, would present a far different question than the one before us. Obviously, the parties contemplated the operation of a retail food supermarket with a bakery operation included. The lessor is adequately protected against any significant alteration of use from that contemplated in the agreement and attached plans and specifications.

From the language used by the parties here, we see no reason to distinguish baked goods from any other merchandise which

might be packaged or processed, or otherwise changed from its original state, into a different form and then transferred or sold to other stores of the lessee or of its sublessee.

We believe what has been said effectively disposes of this appeal; nevertheless, we shall briefly consider other matters suggested by plaintiff in its brief on appeal.

Following the rendition of summary judgment on January 21, 1971, plaintiff, on January 29, 1971, filed its motion to set aside or amend the judgment. In its motion plaintiff alleged that by reason of the affidavit of Chas. R. Bennett, the court had determined a factual issue and thus erroneously rendered summary judgment for defendant. We have heretofore disposed of this contention. Plaintiff's motion was not heard until October 15, 1971. In the meantime, on September 10, 1971, more than seven months after it filed its motion to set aside the judgment, plaintiff filed a motion for leave to take a deposition and submit documentary exhibits in support of its motion to set aside or amend judgment.

The trial court overruled both motions and in its letter of decision, dated October 21, 1971, wrote:

"The parties, in the hearing before this Court of December 21, 1970, agreed on submission of this matter, and that there was no factual dispute and that the question surrounded the interpretation of the lease agreement, which was attached to plaintiff's petition and more particularly paragraph five (5) thereof and the definition of gross sales therein. This Court made its ruling on that matter. . . ."

Plaintiff now contends the trial court erroneously overruled its motion for leave to submit documentary evidence and to take the deposition of John W. Dibble. Plaintiff claims this evidence would show that as of April 1968 each of the Dibble stores were separately incorporated and that Dibble's Fairlawn, Inc., is the only sublessee of the premises involved; and that the other stores being separate corporations cannot be considered affiliate or other stores of the sublessee. Even though not admitted on plaintiff's posttrial motion by the court below, plaintiff has submitted purported certificates of incorporation in the record on appeal. Plaintiff's position in this regard falls for several reasons.

First, as we have noted, the trial court pointed out that both parties agreed in open court, on submission of the case, that there was no factual dispute and that the question was solely an interpretation of the lease agreement. The statement of the trial court in this regard is not challenged or denied. Plaintiff is bound by the

admission. (*In re Estate of Carrell,* 183 Kan. 491, 327 P. 2d 883.)

Second, the trial court refused to admit the evidence when offered with plaintiff's motion. No error in this regard was specified in plaintiff's statement of points on appeal. No issue, other than one going to the jurisdiction of the court over the subject matter of the litigation, will be considered on appeal unless included in the statement of points on appeal, in accordance with Supreme Court Rule No. 6 (*d*) (205 Kan. xxix.) relating to appellate practice. (*Erdman v. Sowle,* 207 Kan. 488, 485 P. 2d 1392; and *Shinkle v. State Highway Commission,* 202 Kan. 448, P. 2d 12.)

Third, plaintiff does not specify the statute relied upon for post judgment relief; however, from the tenor of the arguments advanced it appears that plaintiff was relying on K. S. A. 60-260 (*b*); Mistakes; inadvertence; excusable neglect; newly discovered evidence; fraud, etc. The certificates of incorporation were of public record in the office of the Secretary of State. Plaintiff made no attempt to inject the matter of the separate corporations into the case until seven months after judgment was rendered by the trial court. Plaintiff offered no explanation at the time, or now on appeal, for its failure to produce the certificates, if they were indeed important, prior to submission of the case on the cross-motions for summary judgment. Our statute K. S. A. 60-260 (*b*) is patterned after Rule 60 (*b*) of the Federal Rules of Civil Procedure. (*Neagle v. Brooks,* 203 Kan. 323, 454 P. 2d 544; and *Lackey v. Medora Township,* 194 Kan. 794, 401 P. 2d 911.) In the cases mentioned, federal decisions dealing with 60 (*b*) are discussed and the point is made that a movant seeking relief from a judgment under the rule has the burden of showing how he was justified in failing to avoid mistake, inadvertence or to produce the claimed newly discovered evidence in the first instance.

In *Neagle v. Brooks,* supra, we held:

"A motion for relief from a final judgment under K. S. A. 60-260 (*b*) is addressed to the sound discretion of the trial court, and upon appeal its action is reviewable only for abuse of discretion." (Syl. ¶ 3.)

Under the showing here there is no basis established upon which we could find abuse of discretion by the trial court in denying plaintiff relief under 60-260 (*b*).

With respect to plaintiff's complaint, in this regard, we further note that in his affidavit in support of defendant's motion for summary judgment, John W. Dibble states that he is now the sole owner of the other three Dibble supermarkets, and that at all times

since the commencement of the lease agreement the other stores have been affiliates of and operated with the sublessee. In other words, even though the stores may be separately incorporated, John W. Dibble is now the sole owner and the stores are affiliates of each other.

We conclude the trial court correctly interpreted the plain language of the provision of the lease agreement in question and did not abuse its discretion in denying post judgment relief to plaintiff.

The judgment is affirmed.

SCHROEDER, J., dissenting: In my opinion the "Build and Lease Agreement" should be construed to require the payment of rents based on a percentage of gross sales of the lessee's supermarket, including the portion of baked goods sold or transferred to affiliated stores of the sub-lessee.

In construing the agreement in question the entire instrument must be interpreted as a whole from its four corners. When this is done the controversy can be resolved by determining the intention of the parties without resort to extrinsic evidence.

It seems to me the court has given insufficient consideration and weight to the *use clause* in the agreement. It provides that the building and surrounding area were leased "for operation of a *retail* food supermarket." (Emphasis added).

On the record here presented it must be conceded the sale of that portion of the bakery products here in question was sold at *wholesale* to affiliated stores of the sub-lessee. Whether it be denominated a "sale" or "transfer" as stated in the court's opinion is immaterial.

The foregoing must be reconciled with the facts giving rise to the controversy: (1) The bakery operation is one in which 2,214 square feet of floor space was provided by the lessor for a bakery in the "Build and Lease Agreement"; (2) The sub-lessee conducts baking operations for a period of twenty-four (24) hours per day, employing numerous persons, whose *services* together with raw eggs, milk, flour, sugar and other products are assembled, mixed and baked into finished bakery products "and packaged for ultimate sale at *retail*" (Emphasis added) (quote taken from the Affidavit of John W. Dibble); and (3) None of the bakery products are "transferred" in the original form in which they entered Dibble's Fairlawn Store.

The term "gross sales" in the lease is defined to cover sales of merchandise, *including any service by employees of the lessee and*

*"shall include all sales by every portion and department thereof,* . . *."* (Emphasis added).

Based on the foregoing an interpretation of the entire "Build and Lease Agreement" indicates the parties did not contemplate a *wholesale* operation on the premises for which no rents were payable to the lessor. The operation contemplated by the parties was clearly stated in the first section of the written agreement to be a *retail* food supermarket.

On the foregoing interpretation of the agreement between the parties rent was payable based on a percentage of gross sales of the lessee's supermarket, including the portion of baked goods sold to affiliated stores of the sub-lessee at a wholesale price.

It is respectfully submitted the judgment of the lower court should be reversed.

FATZER, C. J., joins in the foregoing dissent.