SHERWOOD MEDICAL INDUSTRIES, INC., and Krause Dental Supply & Gold Co., Inc., Respondents,

v.

BUILDING LEASING CORPORATION, Appellant.

No. KCD 26742.

Missouri Court of Appeals, Kansas City District.

Aug. 4, 1975.

Motion for Rehearing and/or Transfer Denied Sept. 2, 1975.

Application to Transfer Denied Oct. 13, 1975.

Thomas C. Walsh, St. Louis, Bernard D. Craig, Jr., Kansas City, for appellant.

Joseph E. Stevens, Jr., Irwin E. Blond, Kansas City, for respondents.

Before WASSERSTROM, P. J., and SHANGLER and DIXON, JJ.

WASSERSTROM, Presiding Judge.

Sherwood Medical Industries, Inc. (Sherwood) and Krause Dental Supply & Gold Co., Inc. (Krause) brought this suit against Building Leasing Corporation (BLC) to enjoin interference by BLC with their use and possession of certain leased premises, and to recover damages from BLC for breach of its agreement as landlord to grant quiet enjoyment of those premises. BLC counterclaimed for injunction against further use and occupancy of the property by plaintiffs and for an award for damages against them. The trial court entered judgment for damages against BLC and dismissed BLC's counterclaim. From that judgment BLC appeals.

On December 17, 1956, BLC entered into a lease with A. S. Aloe Company (Aloe) under which BLC agreed to erect for Aloe's use a one-story office and warehouse building to be a part of BLC's Byram Ford Industrial Park. The lease was to continue for a principal term of 30 years, with an option by the tenant to extend the term for three additional 10-year periods. The annual rent reserved was $9,000. Paragraph 5 permitted "such purposes as shall be lawful," and paragraph 17 permitted subletting by the lessee "for any lawful purpose." Paragraph 11 granted the lessee the right to make changes and alterations "as Lessee shall deem necessary or desirable in connection with the requirements of its business" provided that no change should reduce or adversely affect the value of the building nor diminish the utility of the building. Paragraph 10 required Aloe to keep the premises in good repair. Paragraph 18 reserved to BLC the option to terminate the lease upon any default of the lessee if "such default shall not be cured within thirty (30) days after Lessor shall have given to Lessee written notice specifying such default or defaults."

Aloe occupied the building for its business of sale and distribution of medical supplies until January, 1970, at which time it merged with Brunswick Corporation. Brunswick had as a subsidiary Sherwood, which was also engaged in the medical supply business, and Brunswick, upon appropriate notice, assigned the lease to Sherwood. Sherwood occupied until about September, 1970, when it discontinued its business operations in Kansas City and moved out of the building in question.

Sherwood continued to pay rent, but turned the property over to Solbin, a realtor, in an effort to find a sublessee. During the month of October, Solbin took representatives of Krause to go through the premises. On that occasion they were confronted by Barket, president of BLC, who asked what they were doing there. Upon being informed that Solbin represented Aloe, Barket suggested that "perhaps we could deal with him, being that he was in negotiations with Aloe Company to buy back their lease." Barket later commissioned Solbin to act on his behalf in leasing the building. However, BLC failed in its negotiations with Aloe, and on November 6, 1970, a sublease was executed by Sherwood to Krause. Under the sublease the annual rental was $22,389.75, representing a profit to Sherwood of $13,398.75 per annum.

Promptly after execution of the sublease, Krause commenced alterations to the building to better accommodate its business of the sale of dental supplies. The alterations included: dropping the ceiling in the office area and part of the warehouse space by means of a new false ceiling; installing a new central air conditioning and heating system; dividing the office area with moveable partitions; and installing new electric wiring for improved lighting. The alterations also included the opening of three holes in an interior wall, two window size and one door size.

On November 9, very soon after the alterations had begun, BLC sent a letter to

Brunswick notifying of a termination of the underlying lease. In December, shortly after the expiration of the 30-day notice period, BLC blocked Krause from entry into the building by changing locks on the door. Krause managed to gain entry and continued work until sometime in January, when BLC again changed the locks and chained the doors.

On January 25, 1971, Sherwood and Krause filed petition in the Circuit Court for a temporary restraining order which was granted. In due time, BLC filed its answer and counterclaim in which it, in turn, asked for an injunction against Sherwood and Krause. An evidentiary hearing was held, after which the trial court denied injunctive relief to BLC on February 12.

Thereupon, BLC complained to city officials and on February 18, the Kansas City Building Code Engineer notified Krause that it was ordered to cease and desist from further work until a city building permit was obtained. Krause immediately hired the necessary architect and engineer to draw appropriate plans and specifications. An application for the building permit was then filed and the permit was issued on March 1. Construction again began under the permit and was substantially completed by the end of March, 1971. BLC concedes in its brief that "[t]he construction, as finally completed, was structurally sound and in compliance with the building code."

The points made by BLC on this appeal are that: 1) BLC had the right to terminate the lease because Krause breached its duty to use the premises only for lawful purposes and its duty to keep the premises in good repair; 2) the lease did not authorize Krause to make substantial structural modifications to accommodate its business; and 3) damages should not have been imposed against BLC in favor of Sherwood, since BLC was simply making a legitimate attempt to prevent waste to its property and also because Sherwood had no standing to recover damages.

## I.

■ Preliminary to discussing BLC's points on appeal, a pending motion by Sherwood and Krause to dismiss the appeal calls for consideration. Those respondents first directed their motion to the original brief filed by BLC in this court. Thereafter, BLC filed an amended brief. Feeling that the amended brief still did not comply with Rule 84.04(c), V.A.M.R. respondents have renewed their motion to dismiss. BLC's amended brief is not so deficient as to warrant dismissal of the appeal. Respondents' motion is therefore overruled.

## II.

■ BLC's first point, that Krause was not using the premises for a "lawful purpose" and that it failed to keep the premises in good repair, is reduced in the argument portion of its brief to the contention that the attempt to make alterations without a city permit was in and of itself a violation of the lease prohibition against unlawfulness and was sufficient to warrant termination. The basic fallacy in the argument is that the "lawful purpose" clause is violated only when the illegality pertains to a functional use of the premises. In this case the attempt to make alterations was not a functional use, but only a preliminary to the commencement of the desired functional use. The functional use to which Krause proposed to put these premises was that of storing and merchandising dental supplies. BLC does not even claim that there was anything illegal or unlawful in that functional purpose.

Only a single case has been cited or found which in any way indicates that some ancillary legal violation such as that here should be considered as an "unlawful purpose" sufficient upon which to grant a forfeiture of the lease. That case is *American Legion Holding Corporation v. Hurowitz*, 72 S.D. 89, 30 N.W.2d 9 (1947), which held that the lessees' failure to register their trade name under the fictitious name statute rendered their occupancy an "unlawful business or

purpose" within the prohibitory clause of their lease. However, that case was flatly rejected in *FCA Properties v. Hudson Oil Company of United States, Inc.*, 35 Mich. App. 79, 192 N.W.2d 390 (1971), which holds that such a lease provision pertains only to the functional use of the premises and has no reference to compliance or non-compliance with peripheral regulatory statutes. We prefer to follow the *FCA Properties* view. See also *Gasser v. Jet Craft Ltd.*, 87 Nev. 376, 487 P.2d 346 (1971) and *Intertherm, Inc. v. Structural Systems, Inc.*, 504 S.W.2d 64 (Mo.1974).

■ Moreover, the rule uniformly followed is that a lease provision prohibiting an unlawful purpose is not violated by a single act, but rather the prohibition contemplates continuing or customary illegal use. 3A Thompson on Real Property, § 1324, page 551; "Provision of lease or statute as to forfeiture where premises used for unlawful purpose, as contemplating a single use or a continuous use," 145 A.L.R. 1063; *Ruffino v. Ruffino*, 138 So.2d 609 (La.App.1962).

■ The lack of any continuous or customary illegal use in this case is emphasized by the promptness with which Krause corrected its delinquency as soon as this matter of a city permit was called to its attention. Indeed, the failure of BLC to give adequate notice to Krause or its sublessor with respect to this matter, as required by paragraph 18 of the principal lease, in itself constitutes compelling reason why its attempted forfeiture of the lease cannot be given effect. The notice which was sent on November 9, 1970, stated as grounds for forfeiture merely:

"1. The failure of the Lessee to use the leased premises in accordance with the terms and conditions of said lease and to propose certain uses of said premises not lawful nor available to the Lessee;

"2. The failure of the Lessee to keep the leased premises maintained and repaired in accordance with the terms and conditions of the lease."

The trial court found this notice in those generalized, vague terms was inadequate to comply with paragraph 18, and that conclusion is correct. In the absence of sufficient specificity to convey notice to the lessee of the precise nature of his delinquency, forfeiture should not be permitted. *Independence Flying Service, Inc. v. Abitz*, 386 S.W.2d 399, 404 (Mo.1965).

■ BLC argues that the trial court erred in making any reliance upon the adequacy or inadequacy of the notice of termination, taking the position that "[n]o notice whatsoever is or should be required to terminate a lease for misuse or abuse of the landlord's property by the tenant." The cases upon which BLC relies are those where there was no lease provision requiring a notice in order to accomplish a lease termination. That factor completely distinguishes the cases upon which BLC relies. See for example *Geer v. Boston Little Circle Zinc Co.*, 126 Mo.App. 173, 103 S.W. 151, 156 (1907), which holds that " . . . no notice was necessary at common law, *save as provided in the lease.*" (emphasis added).

For the reasons stated, BLC's first point is overruled.

### III.

BLC divides its argument under its second assignment into three subpoints. Each of those will be considered seriatim.

### A.

■ BLC first argues that Krause has made a change in the use of the building so radical as to constitute waste within the meaning of § 537.420, RSMo 1969, V.A.M.S. This contention has two prongs, the first of which charges Krause is departing impermissibly from the original use contemplated by the original parties to the lease, and the new use by Krause will no longer comport with the unified character of the Industrial Park of which the premises are a part. The

second prong of this argument is the claim that the amount of storage space in the leased building has been so far reduced as to change the basic character of the building.

A comparison of the new use proposed by Krause as compared to the original use by Aloe discloses very little dissimilarity. Aloe was in the business of warehousing and merchandising medical supplies, while Krause is in the very similar business of warehousing and merchandising dental supplies. The record shows that the building as altered by Krause could have been used by Aloe for its purposes, and BLC in its brief concedes this to be true.

BLC cites *Fairlawn Plaza Development, Inc. v. Fleming Co., Inc.*, 210 Kan. 459, 502 P.2d 663 (1972), for the proposition that when a building is erected by the landlord specifically for a lessee as part of a shopping center, then that use becomes a special aspect of the contract which cannot be changed by the lessee. It also cites *Coach House of Ward Parkway v. Ward Parkway Shops*, 471 S.W.2d 464 (Mo.1971) for the proposition that Missouri also acknowledges the special qualities and the architectural and business integrity of shopping centers. BLC goes on to argue that an industrial park is just as specialized as a shopping center and should be accorded like special treatment.

The cases cited considered problems quite different from the one here and are not in point. More apropos is *Crestwood Plaza, Inc. v. Kroger Co.*, 520 S.W.2d 93 (Mo.App. 1975), where a building was erected as part of a shopping center by the shopping center operator specifically for the use of Kroger Co. as a retail food supermarket. The lease, however, contained no express restriction on use other than that it must be a "lawful use." Thereafter Kroger became dissatisfied with the premises and (as in the case at bar) found that it could sublease the property at a higher rental, in that case to an electric company. The landlord (like BLC here) offered to buy out the Kroger lease so that it could itself make a new lease at the higher rental. When Kroger refused the lease cancellation, the landlord brought suit for declaratory judgment and injunction to void both the Kroger lease and the sublease from Kroger to the electric company. The St. Louis District of this court held that the Kroger lease did not limit the use to that of a retail food supermarket and did not prohibit the sublease. Like reasoning applies here, so far as the claim of special character of the industrial park is concerned.

With respect to the claimed change in character of the building by reason of reduction in cubic storage space, the record shows that Aloe originally used the building primarily for warehousing with only a small unfinished office. The alterations made by Krause converted part of the warehouse space into a finished display room and did cut down the total storage space primarily because of the lowered false ceiling. However, even the new display space is still used for a storage function.

BLC cites a number of cases for the proposition that a tenant may not make a radical change from the originally contemplated use to something entirely different. Typical of the cases cited is *Ritchie v. State Board of Agriculture*, 219 Mo.App. 90, 266 S.W. 492 (1924), in which this court held that premises leased for farm land could not be converted to a use for the purpose of camping, automobile parking and uses ancillary to a state fair. *Ritchie* and similar cases turn on their facts and do not indicate, much less hold, that the factual situation here constitutes such a radical change in use as to be prohibited.

The trial court after a review of the detailed evidence in this case found that "the business done by Krause is essentially the same as that done by its predecessor Sherwood and that the building is used in essentially the same manner * * * Instead of the building being merely a bare bones warehouse and office space, it is now a finished office area and an improved warehouse area." That finding being reasonable under the evidence, it is adopted.

### B.

BLC next argues that the alteration clause, paragraph 11 of the lease, only permits changes necessary for the business requirements of the original lessee Aloe, and does not give any permission for changes to meet the business requirements of the sublessee Krause. In presenting this argument, BLC does not clearly identify its position; that is, whether (1) it would deny Krause the right to make any alteration, or (2) it means only that Krause cannot make an alteration which would not be necessary for Aloe's requirements if Aloe had continued to occupy for the purposes of Aloe's original business. After a close reading, BLC's argument must be understood as being the latter. If by any chance the broader argument is intended, no authority is cited nor has any been found, and an argument going to such an extent would be so unreasonable as to require rejection. Surely, a sublessee should be permitted at least to make those alterations which would have been permitted to the sublessor. The only question worthy of debate is whether the sublessee may make alterations distinctive to its operations and which would not have been of a character incident to the sublessor's business.

The cases are not in accord as to whether an alteration clause such as the one here authorizes changes in the premises solely to the extent appropriate for the business of the original lessee or whether on the other hand permission under the lease to enter into subleases carries with it the right of the sublessee to make alterations appropriate to its own business, even though its business may be different from that of the original lessor. *F. W. Woolworth Co. v. Nelson*, 204 Ala. 172, 85 So. 449 (1920), cited by BLC, does support the more restrictive view that the permission for alterations "was not intended for the independent use of sublessees and cannot be extended to include the changes prompted by their necessities, much less by considerations of convenience merely." However, that case represents a minority position and cases from Texas, Montana and California hold to the contrary. *Mayer v. Texas Tire & Rubber Co.*, 223 S.W. 874, 875 (Tex.Civ.App.1920); *Fair West Building Corp. v. Trice Floor Coverings*, 394 S.W.2d 707 (Tex.Civ.App. 1965); *Turman v. Safeway Stores, Inc.*, 132 Mont. 273, 317 P.2d 302 (1957); *Spring Street Realty Co. v. Trask*, 126 Cal.App. 765, 15 P.2d 195 (1932). The persuasive ruling of these cases is succinctly stated in *Fair West*:

" . . . the stipulation in the contract according the lessee the right to sublet the premises, in part or in whole, carries with it the right of the lessee to make such changes and additions in the building as are reasonably necessary to the lease of the building by such tenants, provided such changes do not constitute a substantial change in the structural quality of the building, and where the additions can be removed at the expiration of the lease without injury to the building."

But even if the Alabama rule were to be followed, the alterations made by Krause in this case would be authorized. As already stated, the business of Krause is only marginally different from that of Aloe. The alterations made by Krause would have been appropriate to Aloe's original operations and as admitted in BLC's brief, "the building as reconstructed could have been used by Aloe." There being no radical change in the nature of the use, the Krause alterations should be deemed proper under either legal rule.

### C.

For its third subpoint, BLC argues that the Krause alterations reduced the value of the building in violation of paragraph 11 of the lease. This argument strikes an odd chord when considered in the light of the fact that Krause has expended $50,000 on the improvements and the rental value has been increased from $9,000 annually to $22,-389.75.

BLC's principal expert witness attempted to overcome this very obvious hurdle by seeking to draw a distinction between the value of the leasehold to the tenant in contrast to the value of the reversion to the landlord. The attempted distinction is highly artificial under the facts of this case. Obviously the property has greater value now than it had before Krause made its improvements. The real nature of BLC's complaint is that it cannot reap the benefit of that increment in value. However, even though the lease contract negotiated by BLC in 1956 may now have turned out to be disadvantageous to it, that is not the fault of the alterations made by Krause and gives rise to no basis upon which BLC can now declare a forfeiture.

Appraising all of the facts, the trial court found that the Krause improvements "do not damage the building but rather enhance the value of the building" and that the $50,000 improvement "does not damage BLC's reversionary interest." These findings find support in the evidence and will be accepted. Rule 73.01.

IV.

Finally, BLC challenges the award of damages to Sherwood on the grounds that: a) its actions to exclude Krause was a legitimate attempt to prevent Krause from committing waste; and b) Sherwood, to whom the damages were awarded, had abandoned the premises, and therefore had no possessory interest which would support damages for breach of quiet enjoyment.

The defense based on the theory of preventing waste cannot stand in the face of the conclusion already discussed under point III of this opinion that no waste was committed. Furthermore, BLC's right of self-help was limited by paragraph 18 of its lease which required 30-days written notice during which period the lessee and sublessee would have opportunity to cure the default. As already held under point II of this opinion, such notice was not given.

The claim that Sherwood had abandoned the premises is devoid of merit. The fact is that on November 6, 1970, it had entered into a formal sublease with Krause, to which it assumed definite obligations, including a warranty of its legal right to make the lease and a covenant to Krause of the right to quiet enjoyment. Numerous cases hold that a sublessor such as Sherwood here may have a cause of action against the original lessor for interference by the latter with subtenants. "Liability of landlord for interfering with tenants of lessee," 70 A.L.R. 1477.

Affirmed.

All concur.