STATE of Missouri, Respondent,

v.

Ronald SHEETS, Appellant.

No. KCD 29403.

Missouri Court of Appeals, Kansas City District.

April 3, 1978.

Ronald Sheets, pro se.

John D. Ashcroft, Atty. Gen., Michael H. Finkelstein, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P. J., SOMERVILLE, J., and MASON, Special Judge.

DONALD L. MASON, Special Judge.

As a result of a jury trial in the Circuit Court of Bates County, appellant was sentenced to six months imprisonment and a $500.00 fine for the offense of criminal trespass and two years for the offense of kicking a highway patrolman in the performance of his duties.

We are initially confronted with the State's Motion to Dismiss the appeal for failure of the defendant to comply with Rule 84.04, V.A.M.R. Appellant having proclaimed a religious distrust and bias toward lawyers and the organized bar, and questioning their ethics and morals, represented himself throughout. Although a lawyer was appointed by the trial court to assist him, the defendant steadfastly refused to take advantage of this professional assistance. Were it not for the trial error which is dispositive of this appeal, we could agree with the State that defendant's brief "violates every proscription to be found in Rule 84.04." However, that error was adequately preserved and the State's Motion is overruled. This trial error was brought to the trial court's attention in the Motion for New Trial, Rule 27.20, V.A.M.R., *State v. Perryman*, 520 S.W.2d 126[15] (Mo.App. 1975), and adequately briefed and brought to our attention, Rule 84.04, V.A.M.R., *Sherwood Medical Industries, Inc. v. Building Leasing Corporation*, 527 S.W.2d 407 (Mo.App.1975). Only a brief resume of the facts is necessary.

On June 2, 1976, defendant and many of his religious compatriots occupied the building housing the religious group known as the Church of Christ at Zion's Retreat for the professed purpose of holding a prayer meeting. Prior to 1973 defendant and his friends had been members of this sect, but an internal squabble touching upon philosophy and theology led to a Vernon County Circuit Court ordered dissolution and division of the church property with the church building being granted to the above named religious group. Defendant and his faction built their own church building across the road, 80 feet away, and adopted the name of Church of Our Christian Heritage. Apparently, the court action, even though by agreement, did not lessen the tension. On seeing defendant and his friends in the church building, Duane Gayman, the pastor and the president of the corporation which owned the church property, called the church lawyer, who, in turn, called the Vernon County Sheriff's office. This precipitated the arrival of a multitude of law enforcement officers, including the sheriff, deputy sheriffs, state highway patrolmen and the prosecuting attorney. The prosecutor asked defendant and his friends to leave, as did Mr. Gayman. Their refusal prompted a somewhat forceful eviction. As defendant refused to abide by the repeated

requests to vacate the church building, one of the law enforcement officers grabbed defendant and started to pull him from the pew. In being evicted defendant kicked a highway patrolman in the groin. There being no allegation that the evidence was insufficient to support the jury verdicts, this is an adequate synopsis of the background information which gave rise to the criminal charges filed against the defendant and, also, represents an overview of the facts the jury could have found from the evidence adduced.

Subsequently, defendant was charged in the Vernon County Circuit Court with the misdemeanor offense of trespass under Section 560.447(1), and in a separate Information with the felony offense of assaulting a police officer in the performance of his duty under Section 557.215. Thereafter, with the consent of the defendant, an amended Information was filed which charged the defendant with the same offenses in a two count Information. By agreement venue was changed to Bates County. A jury drawn from the citizenry of that county found the defendant guilty of both charges and assessed his punishment at six months in the County Jail and a $500.00 fine on the misdemeanor charge and two years at the Missouri Division of Corrections on the felony charge. Judgment was in accordance with the verdict. This appeal followed. Despite defendant's declaration both ways, this Court does have jurisdiction of this appeal, Section 3, Article V, Missouri Constitution, as amended.

As stated, in both his Motion for New Trial and brief defendant mentions the cross-examination permitted of his witness concerning the religious beliefs of the Church of Our Christian Heritage and peripherally alludes to the prejudice resulting from that cross-examination. The extent and impact of that cross-examination can best be understood by setting it forth verbatim.

"Q Did you think it seemed strange for somebody to preach the eradication of Negroes and Jews in the name of Christianity?

MR. SHEETS: I object, your Honor.

THE COURT: That will be sustained unless there is some showing, Mr. Sanders.

Q (By Mr. Sanders) Does the Church of Our Christian Heritage and the Church of Christ at Zion's Retreat, do you all share the same religious philosophies and theological beliefs?

A We used to.

Q Do you now?

A We share many of them, yes.

MR. SHEETS: I object, your Honor. He is trying to badger my witness.

THE COURT: Overruled.

Q (By Mr. Sanders) What does the Church of Our Christian Heritage believe in regard to Negroes? Do you share philosophies as to Negroes with the Church of Christ?

A Will you be specific?

Q What?

A Can you be more specific? I don't know what you mean.

Q Does the Church of Our Christian Heritage believe Negroes have a soul?

MR. SHEETS: I would like to object on the grounds it is irrelevant and immaterial, your Honor.

THE COURT: This is cross examination. He is entitled to cross examine the witness, so your objection is overruled.

Q (By Mr. Sanders) Do you believe that?

A You asked me if I believe the Negro has a soul?

Q Has a soul. Is the Negro a person who can receive salvation through Jesus Christ the same as you?

A Well, in order to answer that question correctly, I would have to give some background.

Q Do you believe that they do or that they don't?

A You put me in a difficult position.

Q Do you have a belief one way or the other?

A Yes, I do.

Q What is that belief?

A It is that they are not of Adam and, therefore, they don't have a soul.

Q  How about Jews?

A  Jews are not of Adam; therefore, they don't have a soul. Now, if your meaning of a soul is the same as mine, that is like I said, without some preparation to answer a question like that might be stepping off in an abyss.

Q  What is a soul?

A  We are talking about whether the person was created with a body and mind or a body.

THE COURT: Excuse me. Mr. Sheets, that lady has to be quiet or she will be removed from the courtroom. If she wants to write notes to you, that is fine, but the Court will not tolerate any noise.

MR. SHEETS: Yes, sir. We beg your pardon.

THE COURT: You may proceed. Restate your question, Mr. Sanders.

Q  (By Mr. Sanders) Is it your belief that to kill a Negro is essentially the same as killing a cow then?

A  No.

Q  Do you feel that Negroes are God's children then and should be treated better than animals and should be treated like people?

A  You asked me two questions. Which one do you want me to answer first?

Q  Answer them both.

A  First one, do I think that they should be treated better than animals?

Q  Yes.

A  Yes, because they are created above animals. Second question, what was that again, please?

Q  Should they be treated like other people?

A  They should be treated like other people like themselves are.

Q  Should they be treated like Mr. Sheets or like me or like yourself?

A  I would say, no.

Q  Why?

A  It goes back to how they were created. I believe you will find in Genesis, if I could make myself clear—

Q  You don't believe God created man in his own image?

A  I believe there were two creations of man and that is my religious belief.

Q  How about Jews?

MR. SHEETS: Your Honor, I would like to object on the grounds that Mr. Smith is not on trial. His religious beliefs are irrelevant to this case.

MR. SANDERS: Your Honor, I submit they are relevant to the issue of whether or not there is enough religious philosophy, theological consistency between this group and the Church of Christ at Zion's Retreat that they should ever feel welcome to go over there.

THE COURT: The objection is overruled. He may answer the question.

A  Maybe I could clear that up for you, Mr. Sanders, by saying that at one time the Church of Our—I am sorry, the Church of Christ at Zion's Retreat used to believe exactly as we believe.

Q  (By Mr. Sanders) As you believe now?

A  As we believe now.

Q  Duane Gayman used to preach this?

A  Duane Gayman's father started it.

Q  Did Duane Gayman ever preach it?

A  Duane Gayman preached it.

Q  Has it been preached in that church since 1973 or 1974, when the Court dissolved it and awarded the property of one church from the other one; has it ever been preached since then?

A  I have never been there.

Q  Why weren't you there?

A  Because I was over across the street at our own church.

Q  That is right. Because you knew you weren't welcome, is that right?

A  Because I knew we were dissimilar beliefs."

▮ Generally, it is not proper to question a witness concerning his religious faith or beliefs unless relevant to some aspect of the case, *State v. Jackson*, 500 S.W.2d 306 (Mo.App.1973). The State seeks to justify on the four grounds that the interrogation was relevant to show trespass, that defend-

ant opened the inquiry into religion, that the interrogation went to the bias and credibility of the witness, and even if erroneous, it was harmless as cumulative of previous testimony. Only the first ground was advanced during the trial. The State's assertion that inquiry of religious beliefs was broached by the defendant is unfounded. In direct examination of the State's first witness, Duane Gayman, inquiry was made as to the theological differences of the two factions. The testimony elicited was not as detailed as above set forth, except for one question to which an objection was overruled. The inquiry was not opened by defendant, nor can it be supported by the record that the complained of cross examination was cumulative.

The trespass proscribed in the statutory section under which defendant was charged can be committed by entering on property after such entry has been forbidden by the owner, or, remaining on the property after having been ordered to leave. It was under the guise of proving these alternative elements that this cross examination was conducted. The Prosecutor was persistent in developing the witness's religious beliefs. Note the Court's comment in sustaining the initial objection.

The question to which the objection was sustained, and not answered, was philosophical in phrasing and could have no purpose other than to inject prejudice into the case, particularly when considered in the context of the subsequent, more specific questions on the same subject matter. The question is so full of venom the jury is poisoned regardless of the answer. This is akin to asking a male witness if he has stopped beating his wife. The next two questions and answers could conceivably tend to prove an element of the trespass charge, and no objection was voiced. The Prosecutor then immediately retreated to the specifics of the witness's religious beliefs which is transferred to defendant by his admitted membership in the identified religious sect. Those questions and answers could have no conceivable purpose other than to inflame the jury and create prejudice against the defendant. Those questions are not phrased to prove an element of the trespass charge. The defendant objected on the grounds of immateriality and irrelevancy, which is a proper objection, State v. Jackson, supra. The response of the judge to that objection would cause all but the most experienced trial attorney to believe subsequent objections would be futile. In this instance the futility of a future objection is demonstrated as the court continued to overrule.

The inflammatory and prejudicial effect of this cross-examination is readily apparent when compared to other prohibited subject matter. In State v. Cavener, 356 Mo. 602, 202 S.W.2d 869 (1947), the Supreme Court held that persistent inquiry of the wife as to decedent's membership in a Masonic Lodge was for the purpose of prejudicing the defendant and constituted grounds for reversal. In State v. Himmelmann, 399 S.W.2d 58 (Mo.1966), the same court reversed a factually strong assault conviction due to the receipt in evidence of a photograph showing a liquor bottle in defendant's car, holding said evidence to be immaterial to any issue and its receipt prejudicially erroneous. A witness for the State in State v. Baublits, 324 Mo. 1199, 27 S.W.2d 16 (1930), detailed the number and ages of the decedent's children. Although reversed on other grounds, the court held this testimony should not have been admitted. To the same effect, see State v. Johnson, 349 Mo. 910, 163 S.W.2d 780 (1942). In State v. Edmonson, 371 S.W.2d 273 (Mo. 1963), we have the converse situation with defendant complaining of error on the non-receipt of testimony touching upon his marital status, the exclusion of which was held to be proper. In State v. Butler, 309 S.W.2d 155 (Mo.App.1958), it was held the trial court properly excluded defendant's proffered testimony of his "hard rais'n." A new trial was granted in State v. Campbell, 507 S.W.2d 431 (Mo.App.1974), because of a witness's descriptive testimony that "the chest cavity was similar to looking into a garbage can full of liver" as a result of a victim being shot with a .12-gauge shotgun at a distance of 12 feet.

It is difficult for us to conceive of testimony more prejudicial and inflammatory than that which equates the eradication of human beings with barnyard animals. The type of improper testimony demonstrated above pales in its comparison with the testimony received in this case. The trial court erred in the allowance of this prejudicial testimony and a new trial is mandatory.

■ This case being remanded for a new trial makes it unnecessary to rule on alleged instructional error, but a comment on the two verdict director instructions seems apropos so as to prevent repetitive use of those instructions. Section 560.605, V.A. M.S., Laws of 1965, limits the fine that may be imposed at $500.00, not $1,000.00 as the jury was instructed. In a criminal case the jury must be correctly instructed on the range of punishment it may assess, *State v. Adams*, 532 S.W.2d 524 (Mo.App.1976); *State v. Brown*, 554 S.W.2d 574 (Mo.App. 1977).

■ In the verdict director for the felony offense the jury was instructed, to paraphrase, that it need only find that the defendant kicked the highway patrolman while he was in the performance of his official duties. Section 557.215 requires the kicking be the willful act of the defendant. The defendant's intent is an essential element and must be submitted to and found by the jury. There is no MAI–CR instruction for this offense, but a review of MAI–CR instructions 6.22 and 6.24 submitting assault with and without malice (§§ 559.180 and 559.190) is in order and offers guidance.

■ It is conceivable that the retrial of this case will result in further appellate review. With that eventuality in mind it seems proper to caution the appellant that although he has the constitutional right to represent himself, he is held to the same standard. of compliance with trial and appellate court rules and procedures as are those who are admitted to the practice of law, *State v. Cooper*, 541 S.W.2d 40 (Mo. App.1976); *State v. Sterling*, 536 S.W.2d 843 (Mo.App.1976); *Commerce Bank of Kansas City v. Conrad*, 560 S.W.2d 388 (Mo. App.1977).

The judgment is reversed and the cause is remanded for a new trial on all issues.