Bergan, J.
The proof that defendants participated in the assassination of Malcolm X is abundant. The main question of law presented is whether the exclusion of the press and public from the courtroom during a small segment of the trial deprived defendants of their right to a public trial. This right is provided both by the Constitution of the United 'States and by the statutes of New York.
The exclusion occurred during the testimony of a "witness, Timberlake, because it was represented to the court that Timberlake believed his life was in danger if he testified publicly and would refuse to testify on this ground. The exclusion included the testimony of an FBI agent relating to Timberlake.
On one hand a trial can be too “ public ” and defendant be deprived of due process; on the other, it can be too private and defendant be deprived of an open trial. Two Supreme Court cases, each involving a State prosecution, illustrate the extremities of this axis, in one of which (Estes v. Texas, 381 U. S. 532) there was too much publicity; and the other (Matter of Oliver, 333 U. S. 257) in which the whole inquisitory proceeding, including holding the appellant in contempt, was conducted by a State Judge completely in camera.
In the balancing of policy and of interest if, for a good reason related directly to the management of the trial, the Judge closes the courtroom as to the testimony of a witness and *398 otherwise keeps it open to the press and public, a defendant is not necessarily deprived of a “ public ” trial.
A very .recent ease in the Second Circuit, United States ex rel. Bruno v. Herold (408 F. 2d 125, decided Feb. 14, 1969), is rather similar in principle to this one. The prosecution there was for robbery and other crimes. The Trial Judge was informed that a witness for the people ‘ ‘ was in ‘ mortal fear of the “ gang in the courtroom ” ’ ” (408 F. 2d, at p. 127), and when the witness was sworn the Judge observed 30 or 40 people in the courtroom.
The Trial Judge testified 1 ‘ some of them ’ ’ grinned and grimaced and the witness “turned white as a sheet”. It was the Judge’s judgment, based on many years experience, that this was intimidating the witness and so he closed the court room during this testimony.
The Court of Appeals (per Moore, J.) observed (id., p. 127): “ The Judge had to meet an unusual and unexpected courtroom situation in which the interest of the prosecution, the defendant and the witness equally had to be protected. Discretion * * * had to be exercised by the judge responsible for the conduct of the trial. Thus, petitioner was not in fact denied a public trial. The proof supports a conclusion that there was only a partial exclusion on the first day of trial and none on the second. A Sixth Amendment situation is not reached. There was no in camera or secret trial. ’ ’
In a similar direction is United States ex rel. Orlando v. Fay (350 F. 2d 967 [2d Cir.]) where it was held that the constitutional right to a public trial is subject to the power of the Judge to preserve the fairness and orderliness of the proceedings in the court.
The landmark New York case on this question is People v. Jelke (308 N. Y. 56). It is distinguishable. The public and press were excluded throughout the whole of the People’s case. The exclusion had nothing to do with the conduct of the trial or the protection or integrity of the judicial process itself. It was aimed at protecting the public from hearing or reading about the details of a sordid case of offensive obscenity (pp. 60-61).
The ground taken by the Trial Judge, this court held, was not justified in the specifics of the New York statute and ran *399 against the mandate for a public trial (pp. 65-67). It was * ‘ not sanctioned by legislation ’ ’ and ‘ ‘ deprived defendant of a substantial right ” (Fuld, J., p. 67).
Rather similar to Jellce in its policy implications are cases in which it is held that desire of a mature witness to avoid the embarrassment of describing a Mann Act violation in public was not a justification to close the court to the public (United States v. Kobli, 172 F. 2d 919 [3d Cir.]); or rape (Tanksley v. United States, 145 F. 2d 58 [9th Cir.]).
But the rule is different in the case of a very young girl (Callahan v. United States, 240 F. 683). Thus, as United States ex rel. Orlando v. Fay (supra) shows, the right to a public trial is subject to the power of the Judge to protect the essentials of the judicial process — in Fay interruptions of the trial by defendant and a relative in the courtroom.
There are differences, of course, between this present case and Bruno. In the latter there was no objection to closing the courtroom and here there was. But, on the other hand, the witness in Bruno did not say he was frightened—the Judge surmised it.
Here, the lawyer for the witness Timberlake told the Judge on the record the witness feared for his life and threats had been made against him and that he would not testify. The Judge suggested that the witness should be sworn and take his chances on refusing to testify; but to this form of proceeding-defendants objected. They objected also to the court’s order closing the courtroom to the public. Part of the problem was thus created by the defendants’ objection to the only alternative open to the Judge: to swear the witness and hold him in contempt if he refused to testify.
This case, then, is stronger in support of a partial closing of the court than Bruno. It is very different from Jelke, in which the court was closed for the People’s whole case because of the Judge’s purpose to protect the public from learning or hearing sordid details. The exclusion of the public in this present case was directly concerned with the judicial process itself.
When the proof given by a large number of witnesses for the People is considered, the testimony taken during the period of exclusion is minimal. It concerned defendant Hagan’s fleeing *400 and the recovery of his pistol. But Hagan was captured by a mob of people outside the meeting place and, indeed, himself testified he had shot Malcom X. Even if there were error in the exclusion, it should be held beyond a reasonable doubt that it was harmless (Chapman v. California, 386 U. S. 18).
The second main point made by appellants is that it was improper for the prosecutor to comment on and offer evidence of hostility of the Black Muslim faction, to which they belonged, toward Malcom X. One basis of objection is that this hostility related to religious faith and observance (Toomey v. Farley, 2 N Y 2d 71, 82); the other is that it tended to substitute ‘ ‘ collective culpability for a finding of individual guilt” (United States v. Bufalino, 285 F. 2d 408, 417 [2d Cir.]).
But if, indeed, the murder did grow out of the hostility of a religious conflict, this conflict becomes germane to the case. It should not be made inadmissible on general grounds. The relevancy of the relationship is to this specific case. The text and cases cited by the People give general support to a concept which, indeed, seems self-evident (2 Wigmore, Evidence [3d ed., 1940], §§ 389, 390; Sam v. State, 33 Ariz. 383 [1928]; State v. Sing, 114 Ore. 267 [1924]; McManus v. Commonwealth, 91 Pa. 57, 66; Hester v. Commonwealth, 85 Pa. 139,155).
The pretrial discovery rulings of the court were not erroneous and the limitations imposed are consistent with New York practice.
The judgments should be affirmed.
Chief Judge Fuld and Judges Burke, Scileppi, Keating, Breitel and Jasen concur.
Judgments affirmed.