STATE of Missouri, Respondent,

v.

Harold Earl JACKSON, Appellant.

No. KCD 26211.

Missouri Court of Appeals,
Kansas City District.

Oct. 1, 1973.

Michael P. Riley, Carson, Inglish, Monaco & Coil, Jefferson City, for appellant.

John C. Danforth, Atty. Gen., Neil MacFarlane, Asst. Atty. Gen., Jefferson City, for respondent.

Before WASSERSTROM, P. J., and SHANGLER and SWOFFORD, JJ.

SWOFFORD, Judge.

Appellant (hereinafter designated as "defendant"), an inmate in the Missouri State Penitentiary at Jefferson City, was charged by information with striking Cecil Garnett, an officer and guard, with a broken chair leg. This charge is a felony under Section 216.460 RSMo 1969. He was tried and convicted of this offense and sentenced to three (3) years. From this conviction he appeals.

The defendant basically urges that the conviction be reversed upon four grounds: *First,* that the trial court should have directed a verdict of acquittal because the state failed to prove that Cecil Garnett was, in fact, a prison guard so as to bring him within the protective scope of Section 216.460 RSMo 1969; that the best evidence of Garnett's status, his written appointment and employment records, were not offered and thus the state failed to prove an essential element of the offense. *Second,* the court erred in admitting evidence as to the physical condition of Garnett following the assault. *Third,* the court erred in permitting the prosecutor to comment upon the whereabouts of Garnett when counsel for defendant sought to comment that Garnett was not equally available as a witness to him. Fourth, the trial court erred in allowing the state to question defendant and his witnesses concerning their religion, (Muslim followers of Elijah Muhammad).

On May 7, 1971, the defendant and three or four of his fellow inmates were removed from their cells by guards, upon the order of Donald W. Wyrick, Associate Warden of Custody, and taken as a group to maximum security area "B". Wyrick testified that this was done because he was fearful that the Muslims were going to create "serious racial tension" and he feared violence in the penitentiary. The defendant was then serving a sentence of 20 years for armed robbery.

The inmates in the Jackson "group" and those also in the maximum security area when the violence occurred and who testified in the case on behalf of the defendant and the charges for which they were convicted, according to their testimony, were: Nathaniel Taylor alias Shabezz (armed robbery), Rayford (second degree murder), Calvin Lee X. Hayes (rape), Patterson (armed robbery and assault with intent to rob), McAdoo (murder and assault), Lane (murder), and Edward X. Clemens (first degree robbery).

These prisoners (and possibly others) were assembled in the lobby of B. Maximum Security. Garnett and another guard were already in this area.

The prisoners were ordered to strip off their clothing for search. This was done and then someone yelled "Black Power". There followed a brawl or fight during which there was substantial evidence that the defendant struck Cecil Garnett on the neck and back with a broken chair leg, the felony for which he stands charged and convicted, and from which conviction and resulting sentence he seeks our judgment of reversal. Further evidentiary facts disclosed by the record will receive comment as they are pertinent to the points raised by defendant.

The statute under which defendant was convicted is, in pertinent part, as follows:

*"Section 216.460. Conspiracy or assaults by prisoners to guards or inmates, felony, penalty.* If several prisoners combine or any single prisoner offers any violence to any officer, guard or employee of the state department of corrections * * * each of such persons is guilty of a felony, and upon conviction thereof shall be punished by imprisonment * * * for not less than two nor more than five years."

■ It is conceded that this section provides for a felony involving a special offer of violence or assault to a guard or employee of the state department of corrections. It is unlike ordinary felonious assault in that intent to do great bodily harm need not be charged or proved, and self-help or forceable resistance to an order, even though such order is illegal, does not constitute a defense to the charge. State v. Goodman, 425 S.W.2d 69, 73 (Mo.1968); Wintjen v. Missouri, 433 S.W.2d 257, 258 (Mo.1968). The obvious reason for this is the vital necessity of proper penal administration and the maintenance of order and safety and the suppression of crimes in penal institutions.

■ It is likewise conceded that the burden was on the state to establish beyond a reasonable doubt the three essential elements of the offense charged, namely, 1) that Jackson was a prisoner; 2) that Garnett was a guard; and 3) that Jackson assaulted Garnett. We have concluded that the state met its burden on each of these elements and the case was properly submitted to the jury and defendant's motion for a directed verdict of acquittal was properly overruled.

■ In considering the evidence before us as to the sufficiency thereof, we must consider it and the reasonable inferences therefrom in the light most favorable to the state and disregard the evidence and inferences to the contrary. State v. Davis,

367 S.W.2d 517, 519 (Mo.1963); State v. McClinton, 418 S.W.2d 55, 57 (Mo. banc 1967).

■ Harry Lauf, Records Clerk, produced the defendant's records including certified copy of his sentence and judgment and a certified copy of his serial record. These showed that he was an inmate at the penitentiary on May 7, 1971. Indeed, this fact was not disputed and was admitted by defendant in his testimony. The state thus met its burden on the first of the three essential elements. State v. King, 375 S.W.2d 34 (Mo.1964); State v. Denmon, 473 S.W.2d 741, 744 (Mo.1971).

There was substantial evidence that Jackson did in fact assault Garnett.

■ Sergeant Borghardt testified he saw defendant strike Garnett with "some kind of a stick,". Guards Haglin and Jenson saw defendant strike Garnett "several times across the back" with the "leg of a chair"; and Guard Harris saw defendant strike Garnett "across the back of the neck" with the chair leg. This testimony satisfies the state's burden to prove the third essential element, namely, the assault.

This brings us to the second essential element of the offense, namely, that the state must prove that Garnett was in fact a guard within Section 216.460 RSMo 1969. It is in this area that defendant strongly claims that the state failed to meet its burden of proof. We do not agree.

The violence occurred in the lobby of the area known as "B Maximum Security" in the penitentiary, an area barred and off limits to all but authorized personnel and inmates undergoing discipline; Garnett and a guard were "stationed" there when defendant was brought to that area; defendant's Exhibit 1, attached to the transcript entitled "Personnel Pamphlet" portrays, on the second page, a photograph of the authorized uniform for prison officers and presumably and by legitimate inference Garnett was so attired; each of the witnesses referred to Garnett as "Lieutenant"

and so far as this record shows he was the ranking officer in this area at the time, in command of Sergeant Borghardt and Guards Haglin, Jenson and Harris. But even more significant than these facts was the testimony of the defendant. He had known Cecil Garnett during his confinement at the penitentiary; he had no previous "problems" with Garnett and "talked to him a lot", at least once a week when Garnett would stop by the defendant's cell and talk to him about the Muslim religion. He stated he had also seen Garnett at the penitentiary since May 7, 1971.

Dr. Leo Baker, doctor for the state department of corrections for five (5) years, testified he knew Garnett and treated him (and other inmates and guards) following the trouble. He did this in his capacity as a state employee.

It defies the most spendthrift credulity to conclude that a person *not* "an officer, guard or employee of the state department of corrections" could possibly enjoy such widespread freedom of the penitentiary facilities, easy access to the inmates and medical succor furnished by the state, over such a protracted period of time.

Future generations of the judiciary and of the bar who may be required, by reason of their professional obligations, to peruse this opinion may appropriately wonder: What became of Garnett? Why was he not called as a witness by the state to assert his capacity, functions, orders, dress, objectives, the details of the assault and possibly a hundred other relevant details of the events of May 7, 1971?

The answer is not obscure. The prosecutor did not endorse the name of Garnett on the Information as required by Rule 24.17. Although Garnett was present and available and, indeed, proffered, as a witness, upon objection by defense counsel the trial court refused to permit his testimony. More of this incident hereafter.

■ The appellant contends, however, that the best evidence rule required that the appointment and employee records be properly introduced in the record in order to establish that Garnett was in fact a guard. It is the well-settled rule of ancient vintage that the best evidence rule "is dispensed with" in cases involving peace officers. Hart v. Robinett, 5 Mo. 11 (1837). In *Hart,* the court said, 1. c. 16:

> "In case of all peace officers, justices of the peace, constables and others, it is sufficient to prove that they acted in these characters, without producing their appointments."

The same rule was applied in State v. Holcomb, 86 Mo. 371 (1885), where the court held that it was not necessary to produce the official appointments of policemen and deputy marshals and said at 1. c. 377:

> "It was sufficient to show that they acted and were recognized as such officers."

The *Hart* and State v. Holcomb rule in this regard has been followed in the later cases of City of Festus v. Kausler, 77 S. W.2d 197, 199 (Mo.App.1934) and State v. Jacks, 462 S.W.2d 744 (Mo.1971).

This situation falls squarely within the exception above noted to the best evidence rule. It is obvious that Garnett's physical position in the maximum security area; the fact that he was "stationed there"; his title as Lieutenant; his activities with reference to the defendant and the other inmates in that area on May 7, 1971, and the fact that the defendant knew him prior to the assault, all characterize him as a guard and are completely inconsistent with any other capacity.

■ The work of a penitentiary guard is that of a peace officer, maintaining order, preventing escapes and the commission of felonies within the penitentiary and guarding and assisting the inmates.

In the case of State v. Gunn, 326 S.W.2d 314 (Mo. banc 1959), the Board of Police Commissioners of St. Louis filed a mandamus action to require the City to appropri-

ate additional sums as salary for various classes of police personnel. The court was called upon to discuss and to classify various types of employees as to whether they were civilian or police personnel. As to the prison guards, the court said, 1. c. 325:

"Certainly, the actual keeping and custody of prisoners confined in a jail is the performance of an inherent and naked police function. * * * They are essentially police personnel. * * * Holding, as we do, that the prison guards are policemen, they cannot lawfully be employed and paid as civilian personnel * * *"

■ For the reasons here stated, we hold that the state sustained its burden of proof upon all three essential elements of the felony charged and that the trial court did not err in refusing to direct an acquittal on this point.

Dr. Leo Baker, Medical Director of the Missouri State Penitentiary, testified over the objection of defendant's counsel that on May 7, 1971 he examined Officer Garnett, which examination included X-rays, and found that he had fractures of the transverse processes of several vertebrae, a fracture of a rib, and multiple contusions and abrasions to his back, and contusions on the head. On cross-examination by defense counsel, he also testified as to his examinations and findings with reference to injuries sustained by the defendant and seven other inmates.

Defendant urges that the court erred in permitting the testimony as to Garnett's injuries since the same were not relevant to the case. We do not agree.

■ It has long been the rule in Missouri that the physical condition of the victim of an assault is admissible to show the nature and character of the assault. State v. Allen, 246 S.W. 946, 948 (Mo.1922); State v. Henggeler, 312 Mo. 15, 278 S.W. 743 (1925); State v. Carpenter, 436 S.W. 2d 748, 752–753 (Mo.1969); State v. Mucie, 448 S.W.2d 879 (Mo.1970).

■ This evidence was admissible also because it corroborated the testimony above referred to by Garnett's fellow officers, that the defendant had struck Garnett with a chair leg on the back, neck and head—the sites of the injuries found by Doctor Baker. This point is ruled against the defendant.

The next point raised by the defendant is couched in the following language:

"The court erred in allowing the prosecution to comment on the whereabouts of Cecil Garnett when appellant sought to comment that witness was not equally available to appellant."

This point is not clearly defined in either the record or the briefs. The record does show that the body of the Information charging the violation of Section 216.-460 RSMo 1969 specifically named Cecil Garnett as the guard who was assaulted by the defendant. Therefore, the defendant at all times since August 11, 1971 (the date of the Information) was clearly and specifically advised as to the identity of the complaining witness.

Garnett's name, however, was not endorsed upon the Information as required by Rule 24.17, V.A.M.R. When the state offered Garnett's testimony as a witness, counsel for the defense objected because his name was not so endorsed and the court sustained the objection. This objection and ruling was out of the hearing of the jury and before the court's ruling the prosecutor made the unchallenged statement—"His (Garnett's) only testimony in this case will be that he was down there and this affray took place, can't even say who struck him."

■ We believe that it would not have been error for the court, in the exercise of its discretion, to have permitted the endorsement of Garnett's name at trial time and the receipt of his testimony since the defendant would in no sense be surprised that the state would call the person whom the defendant was charged with assaulting.

State v. Strawther, 476 S.W.2d 576, 579–580 (Mo.1972).

The parties hereto have filed in this court a Stipulation of Fact, wherein counsel agree that just before the closing arguments, in conference with the trial court, outside of the hearing of the jury, the trial court instructed counsel (1) that it would allow the prosecutor to comment on the reason Cecil Garnett did not testify, and (2) it would *not* allow defendant to state that the jury could infer that Garnett's testimony would be unfavorable since he was more available to the state as a witness.

Only portions of closing argument of counsel were made a part of the transcript and these portions reveal that the state's attorney told the jury that he had inadvertently omitted to endorse Garnett as a witness; that he had called Garnett as a witness; that objection had been made by counsel, and that the court "properly ruled that he could not testify"; and that is why Garnett did not testify. In response, counsel for defendant stated to the jury, in justification of his action in objecting to Garnett as a witness, "He (Garnett) wasn't endorsed, he wasn't made available until all of a sudden they come in and they want to produce the man.". The transcript then reveals that defense counsel argued at some length as to absence of proof that Garnett was a guard; an employee of the Department of Corrections, and that his personnel records could have been produced, but were not.

It thus appears that defendant now seeks to take advantage of a technical situation of his own creation. The identity of Garnett was known since the Information was filed and he was thus "available" in the sense that he could have been interviewed or his deposition secured. He was present at the trial and proffered as a witness by the state and thus no inference could properly be drawn that his testimony would be unfavorable to the state. The essential elements of the offense were proved by other witnesses with equal or superior knowledge of the facts, Wilson v. Miss Hulling's Cafeterias, Inc., 360 Mo. 559, 229 S.W.2d 556 (1950) and the trial court in the exercise of its discretion excluded Garnett's testimony but permitted the prosecutor to tell the jury why he did not testify. If such action was erroneous, we are convinced that it was not such error as to require the reversal of the conviction.

The defendant relies strongly upon the case of State v. Denmon, supra. In that case, also involving an assault upon a department of corrections guard, another guard, not assaulted but apparently endorsed as a witness was not called by the state. Defense counsel argued to the jury that an inference should be drawn that such guard's testimony would be unfavorable to the state. The prosecutor argued that the guard could have been called by the defendant—the "equally available" argument. Objection to this argument was overruled. The court held that employees of the state were not equally available to the defendant, but held in the context of that case, that no prejudicial error resulted from the court's ruling. We do not find *Denmon* pertinent to or controlling in the case before us.

The final point made by the defendant is that the court erred in permitting the prosecuting attorney to question the defendant and his witnesses concerning their religion.

The record discloses that the defendant offered as a witness one Shabezz, an inmate. On his direct examination he was asked about a lawsuit filed in the federal court against the Warden. The following then appears:

"Q (By defense counsel): Do you know if there was an action ever filed?

A I am pretty sure that one of the *believers* filed one."

On cross-examination, the following appears:

"Q (Prosecuting Attorney): Mr. Shabezz, you referred a moment ago in

your direct examination to *believers,* what do you mean by that?

A The followers of Elijah Muhammad.

Q Is that also known as Black Mosleums (sic)?

A. Yes, it is referred to as Black Mosleums (sic) by the press and other people.

Q But you don't refer to yourself by that name?

A No, we are the same as any other Mosleums (sic) in the world.

Q Is the defendant in this case, Harold Earl Jackson, a member of that?

MR. RILEY: Object to that, fail to see the relevance, injecting religion into this thing.

THE COURT: Sustain the objection.

Q Are you associated with him in any organization, Mr. Jackson?

A He is a fellow believer as myself, one of the followers of Elijah Muhammad.

Q Do you take an oath to support one another in that religion?

A I don't know what you mean 'take an oath'.

Q Do you take an oath to aid and support—

MR. RILEY: Again I renew my objection as totally irrelevant."

There was no ruling on the last objection and the prosecutor continued to question the witness about the tenets of the Muslim religion, without further objection.

On redirect examination defense counsel questioned Shabezz extensively in the area of his religion, including the facts that Muslims do not use alcohol or smoke; believe in peace; do not preach violence; that the *believers* in Jefferson City (penitentiary) "try to stay among themselves"; that he had been in Associate Warden Wyrick's office preceding the affray inquiring about another believer, Gannon; that they believe in God and pray five times a day and that they do not try to overthrow the people that run the penitentiary.

Defense witnesses Rayford, Hayes, Patterson, Clemens and McAdoo, all inmates, were each questioned briefly about their membership in the Muslim religion by either or both the prosecuting attorney and defense counsel, who made no further objection to this line of interrogation.

The defendant Jackson testified in his own behalf and as part of his direct examination by his counsel he was asked about the Muslims; his conversation with Garnett about them; the activities of the Muslims in the penitentiary in preventing tension and crime; the recreational programs of the Muslims and religious meetings and services.

Donald W. Wyrick, Associate Warden, was called as a witness for the defense and it was brought out by him that he was fearful that Jackson and his "brothers" were creating serious racial tension; that Jackson and his group had been performing military drills in the recreation yards and dressing in garb that would make them stand out; that the other inmates, both black and white, were getting tired of this and threatening action on their own; that several knives had been found during this period; that he was fearful that the Muslims were going to create violence in the prison.

It is the general rule that questioning of a witness regarding his religious faith or beliefs or membership in religious organizations or lodges is not proper unless relevant to some aspect of the case, and is subject to proper objection. McCormick on Evidence, p. 101 (2nd. ed. 1972); 8 Wigmore on Evidence, § 2213 (McNaughton rev. 1961); State v. Cavener, 356 Mo. 602, 202 S.W.2d 869 (1947); State v. Koen, 468 S.W.2d 625 (Mo.1971).

The record before us does not justify the application of this general rule for two reasons:

■ *First,* upon the initial mention of Jackson's membership in the Muslim religion in the cross-examination of defense witness Shabezz an objection was made and sustained. Almost immediately thereafter a second objection was made and the court made no ruling and was not requested to do so. Thereafter, throughout the trial no further objection to any of the testimony regarding the Muslim religion was made by defense counsel, no request was made of the court to declare a mistrial and discharge the jury nor to instruct the jury to disregard the evidence as to religion. The defendant asserts in his brief that no further objections were made for the reason that his objection during the examination of Shabezz was "overruled by the court" (in fact, it was *sustained*) and further objections would be "futile" and "further inflame the jury and call attention to the matter." It is, of course, so well established in our procedural law as not to require citation of authorities that proper objections to inadmissible evidence must be promptly made and adversely ruled in order to preserve error. If upon considerations of trial strategy this right is not exercised, any such error passes from the case unless the evidence thus admitted is so inflammatory and prejudicial as to corrupt the whole trial process and require judicial relief as plain error. No such claim is made here.

■ But even more convincing that defendant's point here asserted should be rejected is the fact that after making his two objections in the Shabezz testimony (one of which was ruled in his favor and the other not ruled at all) the defendant entered enthusiastically into the evidentiary exploration of the Muslim religion, not only with the witnesses but with the defendant.

*Second,* based upon this record and particularly the testimony of Associate Warden Wyrick, it would appear that the testimony was relevant to the situation which led to the affray of May 7, 1971. The jury could well have concluded that the organization of Muslims at the penitentiary, their beliefs and activities contributed directly to the tension, violation of rules, the incidents in the maximum security area and the resulting assault upon Garnett. People v. Hagan, 24 N.Y.2d 395, 300 N.Y. S.2d 835, 248 N.E.2d 588 (1969).

The final point is ruled against defendant.

Finding no reversible error in this record, the judgment is affirmed.

All concur.