Norman BUTLER, Petitioner,

v.

Harold J. SMITH, Superintendent, Attica
Correctional Facility, Respondent.

No. 76 Civ. 534.

United States District Court,
S. D. New York.

July 26, 1976.

Norman Butler, pro se.

Robert M. Morgenthau, Dist. Atty., New
York County, New York City, by Allen Al-
pert, Asst. Dist. Atty., New York City, of
counsel, for respondent.

MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.

Petitioner, presently serving a term of
life imprisonment at the Attica Correctional
Facility for the murder of the Black Muslim
leader Malcolm X, seeks his release on a

writ of habeas corpus pursuant to 28 U.S.C. § 2254. This application is based on the following claims:

(1) the exclusion of spectators and members of the press from the courtroom during the brief testimony of two of the People's witnesses violated petitioner's right to a public trial under the United States Constitution,

(2) the jury was improperly influenced by the receipt of evidence of the defendants' religious beliefs which had been introduced in order to show a motive for the murder,

(3) the Court, by rebuking counsel for one of petitioner's co-defendants in the presence of the jury, deprived petitioner of a fair trial, and

(4) the trial court's refusal to require the State to provide defendants with a list of the people who had been interviewed by the police during the investigation of the murder, a list of the people who had testified before the grand jury, and a list of the people whom the State intended to call as witnesses at trial violated principles of fundamental fairness.

Three of the above claims (1, 2 and 4) were fully briefed and argued on petitioner's direct appeal of his conviction and both the Appellate Division and the New York Court of Appeals specifically addressed the issues raised thereby, rejecting each of petitioner's objections in thorough, well-reasoned opinions. We see no reason to disturb the conclusions reached therein. The third claim—that of improper conduct on the part of the trial judge—was apparently never raised by petitioner on his direct appeal. Nevertheless, rather than dismissing such claim on the sole ground of failure to exhaust (28 U.S.C. § 2254(b) and (c)), we have determined that on the merits nothing the trial judge did or said can reasonably be construed as depriving petitioner of a fair and impartial trial.

With respect to the merits of claims (1), (2) and (4), we share the reluctance—often expressed in this Circuit—of other "federal judges sitting in habeas corpus . . . to retry the case from the vantage point of their reflective wisdom". *U. S. ex rel. Bruno v. Herold* (2d Cir. 1969) 408 F.2d 125, 129. Of particular note in this respect is the fact that petitioner was tried and convicted ten years ago and the record we are asked to review has, of necessity, become quite cold. *See U.S. ex rel. Smallwood v. LaValle* (E.D.N.Y.1974) 377 F.Supp. 1148, 1153, *aff'd without opinion,* 508 F.2d 837 (2d Cir. 1974), *cert. den.,* 421 U.S. 920, 95 S.Ct. 1586, 43 L.Ed.2d 788 (1975) (". . . this court is very reluctant to second-guess the trial court's discretion on a cold record *four years hence".)* (emphasis added).

Before we discuss each of petitioner's claims in more detail, a brief sketch of the background facts is necessary to place these claims in their proper perspective.[1]

---

1. It is perhaps necessary also at this point to outline the history of the instant proceeding, as petitioner has in his Reply brief questioned the good faith of the Court.

 1. On April 19, 1976, and after service of respondent's brief, petitioner requested that he be furnished with the transcript of the trial record so as to prepare his Reply.

 2. Efforts by my staff to locate a duplicate copy of said record with petitioner's previous attorneys were to no avail.

 3. The District Attorney's Office informed the Court that only one other transcript was extant, that being in the possession of the Supreme Court, New York County; however, that set only included Vols. I–V, whereas the set lent to this Court by the D.A. included six volumes (the sixth volume being comprised of the final part of the trial court's charge, the verdict and photographic exhibits).

 4. Since there was thus only one copy of Vol. VI and it appearing that nothing in the Petition made said volume relevant, we determined to forward only Vols. I–V to Attica for petitioner's use in preparation of his Reply.

 5. On May 10, 1976, Vols. I–V were forwarded to Attica, with instructions that they be returned after 10 days, the time provided for in the Rules for preparation of a Reply.

 6. Three extensions of time—until July 21, 1976—were granted to petitioner by the Court.

 7. On July 13, 1976, the Court denied a motion by petitioner to dismiss his petition without prejudice. As we noted in our Memorandum and Order of that date, the purpose of said motion was to circumvent our previ-

Malcolm X, a prominent Black leader and important member of the Nation of Islam (commonly known as the Black Muslims), was brutally murdered on the afternoon of February 21, 1965 while addressing a meeting of his followers in the Audubon Ballroom in Manhattan. Prior thereto, he had split with the Nation of Islam in a bitter dispute, taking with him many of its members. On March 10, 1965, a New York County grand jury returned a one count indictment for Murder in the First Degree against Norman Butler (the petitioner herein), Thomas Hagan and Thomas Johnson, the three Muslims claimed to have shot Malcolm X repeatedly with pistols and a shotgun. Trial commenced on December 6, 1965 before Justice Marks and a jury and ended on March 10, 1966 with a verdict of guilty against all three defendants, each of whom were sentenced to life imprisonment. The judgments of conviction were unanimously affirmed by the Appellate Division, First Department on May 22, 1968 (*People v. Hagan, Butler and Johnson,* 29 A.D.2d 931, 289 N.Y.S.2d 384) and by the Court of Appeals on April 16, 1969, (24 N.Y.2d 395, 300 N.Y.S.2d 835, 248 N.E.2d 588). On October 27, 1969, the United States Supreme Court denied certiorari. *Hayer a/k/a Hagan, et al. v. New York,* 396 U.S. 886, 90 S.Ct. 173, 24 L.Ed.2d 161.

## I. *Exclusion of the Public and Press*

Petitioner's primary ground of attack against his conviction is that the temporary exclusion from the court of the public and members of the press during the testimony of two of the state's relatively minor witnesses was in violation of his Sixth Amendment right to a public trial. At one point in the presentation of the prosecution's case, an application was made to the Court

on behalf of one Ronald Timberlake, who was scheduled to be the next witness, to clear the courtroom. A Mr. W. Eugene Sharpe, attorney for the witness, explained to the Court that Mr. Timberlake was "in mortal fear of testifying in an open courtroom because threats have been made on his life consistently since the incident which is at issue here at trial". Transcript, at 1273–4. Timberlake himself told the Court that he had received anonymous threatening telephone calls (Tr. 1282). Despite the fact that security measures had been taken in the courtroom since the inception of the trial, in that all spectators were searched for weapons before being admitted—a fact of which the Court reminded the witness—he remained steadfast in his refusal to testify unless the courtroom was cleared. So great was his fear of retaliation that an offer of police protection was rejected as inadequate. Nor would he agree to testify when threatened with contempt. Reluctant to accede to Timberlake's application, the Court ruled that he would have to take the witness stand, make his refusals and accept the consequences (Tr. 1278). The defendants, however, objected in concert, citing the prejudicial impact on the jury of a fearful witness' steadfast refusal to testify (Tr. 1281–7). After a short recess, the Court ordered all spectators and members of the press excluded during Timberlake's testimony (Tr. 1288). In support of his decision, he cited *People v. Jelke* (1954) 308 N.Y. 56, 63, 123 N.E.2d 769 for the proposition that the right to a public trial, although a basic privilege, has "never been viewed as imposing a rigid, inflexible strait jacket on the courts. It has uniformly been held to be subject to the inherent power of the court to preserve order and decorum in the courtroom, to protect the rights of par-

ous denial of any further extensions of time within which to file petitioner's Reply brief, in that he expected to refile a second petition when he had more time. Specifically, he claimed that in order to adequately document a 13th hour contention that the trial judge behaved improperly towards defense counsel while charging the jury, he must have access to that part of the court's charge as was

contained in Vol. VI. Since such a claim is not the proper subject of a Reply brief (not having been made heretofore) and because our reading of the charge disclosed nothing even arguably prejudicial, we denied his motion to dismiss without prejudice, citing the statutory policy against repetitive writs. (28 U.S.C. § 2244).

ties and witnesses, and generally further the administration of justice" (Tr. 1289). The court specifically found Timberlake sincere in his belief that testifying for the State would place him in mortal danger and concluded further that he would persist in his refusal to testify in a public courtroom, thus frustrating the adjudicatory process. Accordingly, the court concluded that the facts warranted the exercise of its inherent power to exclude (Tr. 1290–1). Somewhat later in the prosecution's case, an F.B.I. agent, John C. Sullivan, was briefly called to the stand for the purpose, *inter alia*, of corroborating Timberlake's earlier account of having retrieved one of the murder weapons—belonging to petitioner's co-defendant, Hagan—at the scene of the crime. In order to protect Timberlake's identity— which would of necessity be revealed in Agent Sullivan's testimony—the court again excluded the press and the public (Tr. 1768–72).

 As noted by the courts in this and other Circuits, the Sixth Amendment right to a public trial is not absolute, but rather, must be balanced against other interests— such as protecting a witness from intimidation[2] or embarrassment,[3] maintaining the fairness and orderliness of the proceedings,[4] or protecting trade secrets[5] or the confidentiality of law enforcement techniques[6] —which might justify exclusion. *U.S. ex rel. Lloyd v. Vincent* (2d Cir. 1975) 520 F.2d 1272, 1273–4, *cert. den.,* 423 U.S. 937, 96

S.Ct. 296, 46 L.Ed.2d 269. In the instant case, the record amply supports the trial court's finding as to the sincerity and depth of the witness' fear and its determination that the orderly administration of justice would be frustrated unless the courtroom was cleared.[7] The background of and atmosphere at the trial was such that security measures had already been instituted, at least one juror had expressed fear for his personal safety when his identity had become known (Carter, Tr. 75–6) and the People's first witness, one Thomas, had been afraid to testify in the grand jury (Tr. 472). Indeed, the very nature of the state's evidence against the defendants disclosed an incredibly hostile and vicious climate of hate and revenge which set the stage for a brutal, political murder of a one-time leader now viewed as a traitor. Given such a climate, it is not at all surprising that one called to testify against those claimed to be responsible would fear for his life.

Equally significant is the relatively minimal duration of the exclusion, for as stated by the Court in *U. S. ex rel. Smallwood v. LaValle* (E.D.N.Y.1974) 377 F.Supp. 1148, 1151, *aff'd without opinion,* 508 F.2d 837 (2d Cir. 1974) *cert. den.,* 421 U.S. 920, 95 S.Ct. 1586, 43 L.Ed.2d 788 (1975), in cases involving exclusion for the protection of a witness, it is the length of time of the exclusion, rather than the number of people excluded, that is important. Timberlake was only one of twenty-three prosecution witnesses; his entire testimony—which, as it

---

2. *U.S. ex rel. Bruno v. Herold* (2d Cir. 1969) 408 F.2d 125, *cert. den.,* 397 U.S. 957, 90 S.Ct. 947, 25 L.Ed.2d 141.

3. *Geise v. U.S.* (9th Cir. 1958) 262 F.2d 151, *cert. den.,* 361 U.S. 842, 80 S.Ct. 94, 4 L.Ed.2d 80; *Melanson v. O'Brien* (1st Cir. 1951) 191 F.2d 963.

4. *U.S. ex rel. Orlando v. Fay* (2d Cir. 1965) 350 F.2d 967, *cert. den. sub nom. Orlando v. Follette* (1966) 384 U.S. 1008, 86 S.Ct. 1961, 16 L.Ed.2d 1021.

5. *Stamicarbon, N.V. v. American Cyanamid Co.* (2d Cir. 1974) 506 F.2d 532.

6. *U. S. ex rel. Lloyd v. Vincent* (2d Cir. 1975) 520 F.2d 1272, *cert. den.,* 423 U.S. 937, 96 S.Ct. 296, 46 L.Ed.2d 269; *U.S. v. Bell* (2d Cir.) 464

F.2d 667, *cert. den.,* 409 U.S. 991, 93 S.Ct. 335, 34 L.Ed.2d 258 (1972).

7. Petitioner contends—without citation of authority—that the trial court should have conducted a hearing, under oath, to develop more fully the reasons for Timberlake's refusal to testify in open court. Given the extent of the inquiry that was made by the court, such a hearing does not appear to be constitutionally mandated. *U. S. ex rel. Smallwood v. LaValle* (E.D.N.Y.1974) 377 F.Supp. 1148, 1152–3, *aff'd,* 2 Cir., 508 F.2d 837, *cert. den.,* 421 U.S. 920, 95 S.Ct. 1586, 43 L.Ed.2d 788 (1975). See also *U. S. ex rel. Lloyd v. Vincent, supra; U. S. ex rel. Orlando v. Fay, supra* and *U. S. ex rel. Bruno v. Herold, supra.*

related to petitioner, was merely cumulative of the testimony of several other witnesses—occupied 144 pages of a 4,414 page trial record; Sullivan's testimony occupied only 21 pages; and the courtroom was only closed for seven hours of a three month trial.[8]

Moreover, petitioner has failed to suggest, much less show, how he was prejudiced by such a minimal and relatively insignificant, period of exclusion. Indeed, the Appellate Division on petitioner's direct appeal found it "inconceivable that a public hearing as to these witnesses would have induced potential evidence for the defense which the vastly greater publicly given testimony failed to evoke". *People v. Hagan, et al., supra,* 29 A.D.2d at 932, 289 N.Y.S.2d at 385. We are constrained to agree. We also endorse as accurate the observation of the Court of Appeals that defendants were at least partially responsible for the exclusion order, in that they objected "to the only alternative open to the Judge: to swear the witness and hold him in contempt if he refused to testify". *People v. Hagan, supra,* 24 N.Y.2d at 399, 300 N.Y.S.2d at 838, 248 N.E.2d at 591.

In conclusion, we note that Judge Neaher, in an unrelated case, was asked to reject the reasoning behind the New York Court of Appeals decision affirming this petitioner's conviction. He declined to do so, ruling that the exclusion of the public in petitioner's trial had been a "sensible accommodation[s] to the rights of defendants, witnesses, and the integrity of the State's judicial process, and completely consistent with fundamental notions of due process and the generally recognized contours of the public trial right". *U. S. ex rel. Smallwood v. LaValle, supra,* at 1153, n. 12. Judge Neaher's decision was unanimously affirmed by our Court of Appeals. *Id.,* 508 F.2d 837, *cert. den.,* 421 U.S. 920, 95 S.Ct. 1586, 43 L.Ed.2d 788.

## II. *Admissibility of Evidence Concerning the Defendants' Membership in the Black Muslim Organization*

■ Petitioner's second main claim is that the receipt into evidence of testimony concerning the defendants' membership in the Black Muslim organization, Malcolm X's break with the Muslims, and his founding of the Organization for Afro-American Unity unnecessarily inflamed the jury and tended to substitute collective culpability for a finding of individual guilt. After carefully reviewing the trial transcript, we agree with the state court's conclusion that such evidence was relevant for the specific purpose of establishing motive. *People v. Hagan* (1969) 24 N.Y.2d 395, 400, 300 N.Y. S.2d 835, 248 N.E.2d 588. It was not utilized for any other purpose. In fact, a great deal of testimony of this ilk was offered by the defendants' own witnesses *e. g.,* Tr. at 2757–61, 2867–2871, 3028–9, 3247, 3277, 3284, 3287–9, 3291. Petitioner's guilt was not established by proof of the hostile sentiments of the Black Muslims or petitioner's membership in that group. That evidence merely provided a reason for the murder. Rather, his guilt was established by eyewitness testimony that he did in fact shoot Malcolm X. Without testimony establishing a motive, the murder would have appeared so bizarre as to call in question the accuracy of the testimony describing it. Petitioner has suggested no constitutional infirmity in the procedure followed, nor can we imagine any.

## III. *Trial Court's Conduct Towards Defense Counsel*

■ ■ Petitioner's claim that the trial judge's repeated rebuking of defense counsel in the presence of the jury deprived him of an impartial trial was apparently never raised on his direct appeal, and thus should be dismissed for failure to exhaust 28 U.S.C. § 2254(b). However, as earlier indicated, we prefer to dismiss on the merits.

---

**8.** As noted by the Appellate Division on the direct appeal, the period of public exclusion was less than 3% of the time taken for trial.

Petitioner's contentions are stated in conclusory fashion, supported by only two citations to the record, both of which involve incidents concerning counsel other than his own. There is no allegation of any improper conduct on the judge's part with respect to his own counsel, Messrs. Williams and Chance. In any event, the two incidents referred to by petitioner reflect (1) an attempt by the judge to limit unduly long cross-examination, and (2) an attempt to curb counsel's own improper conduct. Not only did the court proceed in a cautious and restrained manner, but it was at pains to insure that none of the exchanges between it and counsel inured to the detriment of the defendants in the jury's eyes (Tr. 3638–9). Our review of the transcript reveals a long, arduous and emotion-charged trial which was remarkably free of inappropriate behavior or comment by the trial judge. Nothing he said or did can reasonably be construed as depriving petitioner of a fair and impartial trial.

IV. *Failure to Disclose Witness Lists*

■ Of the numerous motions made by defense counsel for disclosure of witness lists, only one was joined in by petitioner, the denial of which is the only issue now before us on his fourth claim. That motion was one made during the *voir dire,* for a list of all those individuals who would be called as witnesses for the State. There being no constitutional requirement that the prosecution provide defendants with such a list,[9] the sole question before us is whether the failure to disclose deprived petitioner of a fair trial. We have concluded that this question must be answered in the negative. In this regard, we note that the Court declined to order disclosure on the prosecutor's good faith representation that attempts had already been made by members of the Black Muslim organization to intimidate various potential witnesses and because the State feared that such efforts would increase in the event that witnesses' identities were disclosed; the prosecution did turn over to defense counsel any statements of a witness at the conclusion of that witness' direct testimony; in denying the defendants' motion for disclosure, the Court indicated that it would be favorably inclined to grant any requests for adjournments if during the cross-examination of any of the State's witnesses, defense counsel needed more time to investigate the witness, and the prosecutor voluntarily and in the interest of judicial economy 12 days before the State rested, provided defense counsel with a list of the names and addresses of everyone who had been interviewed in connection with the case.

For the reasons set forth above, the petition is denied and the case dismissed. Let judgment enter.

SO ORDERED.

---

**9.** *Barrington v. Missouri* (1907) 205 U.S. 483, 488, 27 S.Ct. 582, 51 L.Ed. 890; *Thiede v. Utah Territory* (1895) 159 U.S. 510, 514, 16 S.Ct. 62, 40 L.Ed. 237. See also *U. S. v. Cannone* (2d Cir. 1975) 528 F.2d 296.