Cooke, J. (dissenting).
I dissent and vote to affirm the judgment of the Appellate Division.
While court closures may be employed at times for narrowly circumscribed purposes, in this instance invocation of this drastic remedy, without notice, without a hearing, and without substantiation of a clear and present State necessity, abridged the rights of the press to report true accounts of public proceedings and deprived the public of a free flow of information in which they have a great interest. In the absence of compelling necessity, public scrutiny of the administration of justice and the effectiveness of law enforcement agencies cannot be foreclosed.
Petitioner corporation owns and operates two dailies and a television station in the Greater Rochester area. With public attention focused upon the suspicious circumstances surrounding the mysterious disappearance of former Brighton, New York, policeman Wayne Clapp in July, 1976 and the subsequent apprehension and extradition of his alleged slayers, 21-year-old David R. Jones and his 16-year-old companion, Kyle E. Greathouse, in the State of Michigan six days later, petitioner’s newspapers and television studios devoted a great deal of time, manpower and resources to report the investigation of the case and the pretrial proceedings. The notoriety of the crime was heightened by the failure of the police to recover Wayne Clapp’s body from Seneca Lake where, allegedly, it had been dumped after the murder.
When, however, petitioner’s reporter Carol Ritter appeared to observe the suppression hearing on November 4, 1976, both defendants, without prior notice, joined in an oral motion to exclude the press and public from the courtroom. Without insisting upon notice to the press and without directing a hearing on the application, the County Court summarily granted the application, "the court: [S]ince these matters are in the nature of a Huntley hearing and suppression of physical evidence, and it is not the trial of the matter * * * [cjertain evidentiary matters may come up in the testimony of the People’s witnesses that may be prejudicial to the defendant”.
On advice of counsel, petitioner’s reporter requested in writing a postponement of the suppression hearing in order to afford the news media’s attorneys an opportunity to appear and prepare argument against the order of closure. Upon denial, petitioner moved by order to show cause, dated Novem *383 ber 8, 1976, to vacate the closure order so that petitioner’s employees could gain access to the transcripts of the hearing. Although the court conceded, at argument on the motion, that it was regrettable that counsel for the petitioner had not been in court when the motion for closure was made, the court denied the application and adhered to its prior order. In rejecting petitioner’s contention that the effect of the order was to deprive the press of its First Amendment function, the court reasoned that the case was unique, that a reasonable probability of prejudice was a consequence of the publication of the happening of the suppression hearing, and that the defendants, as movants for an order of closure, did not bear the burden of establishing prejudice.
Thereafter, petitioner commenced this article 78 proceeding in the Appellate Division, Fourth Department, to prohibit enforcement of County Court’s order. The Fourth Department unanimously sustained the petition, vacated the order of closure and enjoined its enforcement, holding: "The exclusionary order entered by the County Court is not supported by a showing of compelling factual circumstances. * * * No finding was made concerning the extent of pretrial coverage in the case, the impact which the disclosures would be expected to produce, the size of the prospective jury pool in Seneca County nor as to any other matter that would indicate with a reasonable amount of certainty that the defendants could not receive a fair trial in Seneca County without a closed Huntley hearing. The closure order entered here lacks the requisite factual basis necessary to overcome the right of the public and press to open judicial proceedings” (55 AD2d 107, 110).
On appeal to this court, appellants urge that there exists a fundamental distinction between the prohibited blanket "gag” order (see Nebraska Press Assn, v Stuart, 427 US 539) and a direction to close the courtroom doors. Unlike the "gag” order which bars the press from reporting matter which is otherwise open to the public, the closure order merely regulates access to information and does not prohibit dissemination of any news. The government, appellants maintain, may have no right to interpose a prior restraint on publication, but it certainly has no duty to supply the press with access to information. Further, it is urged that courts have inherent power to preserve order and decorum and to protect the rights of parties and witnesses.
To be sure, the trial court has a wide range of powers at its *384 disposal to assure a fair trial to the parties affected, but the power to isolate judicial proceedings from the scrutiny of the public, absent compelling State necessity, is not numbered among them. "The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions * * * are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of government” (Cox Broadcasting Corp. v Cohn, 420 US 469, 492; Estes v Texas, 381 US 532, 541-542). In light of Nebraska Press, this court can hardly deny the media’s right and obligation to report on the function of judicial tribunals. By the same token, the premise that there is any significant difference in denying access to information about a matter of public interest—upon undocumented, unproven, and conclusory allegations of possible prejudice—assumes that the right to observe an otherwise public proceeding is severable from and of less value than the right to convey information about it. Any such distinction is without substance, since the right of free expression must encompass both the freedom to convey information about a public matter and the liberty to gain access to proceedings involving the same. A closed proceeding should be recognized for what it is—a "serious backdoor threat to First Amendment interests” (Staff of Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 94th Cong, 2d Sess, Free Press— Fair Trial [1976]).
This court’s recognition of an exclusion order as a general prophylactic against the influence of unknown and undocumented prejudices upon the tribunal’s deliberative function suggests an almost casual acceptance of a prior burden on the freedom of the press, a burden presumptively repugnant to the ends of the First Amendment (see Bantam Books v Sullivan, 372 US 58, 70). The effectiveness of such an order cannot be seriously doubted, but the right to report the news is too vital to the nature of a free State to allow the press to be stifled under the pressure of direct "gag” orders, or even more subtle means of accomplishing the same illicit end (Near v Minnesota ex rel. Olson, 283 US 697, 713-714): [S]peech concerning public affairs is more than self-expression; it is the essence of self-government. The First and Fourteenth Amendments embody our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, *385 caustic, and sometimes unpleasantly sharp attacks on government and public officials.’ New York Times Co. v. Sullivan, 376 U.S. [254], at 270.” (Garrison v Louisiana, 379 US 64, 74-75 [emphasis added].) Absent compelling and overriding State necessity, the right of the public to gain information about public matters may not be infringed (Schenck v United States, 249 US 47, 52; Brandenburg v Ohio, 395 US 444).
The necessity for public inspection is not diminished because the proceeding is a pretrial hearing to suppress evidence illegally obtained. Suspicion enshrouds whatever determination is not freely aired in a forum open to public inspection, scrutiny and, sometimes, even scorn. The public has the right to know that the Constitution protects equally each person accused of a crime, and has the right to scrutinize the effectiveness of police agencies in coping with criminal activity. "[T]he testimony of police officers regarding police conduct which usually occurs more or less in private within an environment which the police themselves create and in which they reign, should not be given in secret” (United States ex rel. Bennett v Rundle, 419 F2d 599, 606).
At times, the public interest may command otherwise. Thus, it has been held that necessity demands that the doors of the courtroom be closed for the protection of undercover agents (People v Hinton, 31 NY2d 71, 74; People v Hagan, 24 NY2d 395; People v Garcia, 51 AD2d 329, affd 41 NY2d 861; United States ex rel. Lloyd v Vincent, 520 F2d 1272, 1274, cert den 423 US 937), for the protection of witnesses who might be unduly inhibited from or embarrassed by relating the substance of their testimony in front of an audience (People v Jelke, 308 NY 56, 63; People v Hall, 51 App Div 57; Cook, Constitutional Rights of the Accused: Trial Rights, § 101), and for the preservation of public sensibilities (Matter of Oliver v Postel, 30 NY2d 171, 179; Matter of United Press Assns. v Valente, 308 NY 71; People v Jelke, supra; see, also, People v Nicholas, 35 AD2d 18). However, under these circumstances, closure does not contemplate the isolation of the tribunal from its milieu to diminish the possible effects of feedback from the community upon the ultimate disposition. Rather, it seeks to protect the actors in the controversy from personal repercussions which the law deems serious enough to warrant extraordinary precaution or, in the case of matter offensive to public sensibility, to preclude dissemination under a judicial aegis of unlawful material in which, ab initio, the general public has *386 no legitimate interest. Nevertheless, "any claim of practical justification for a departure from the constitutional requirement of a public trial must be tested by a standard of strict and inescapable necessity” (United States ex rel Bennett v Rundle, 419 F2d 599, 607, supra; United States ex rel. Lloyd v Vincent, 520 F2d 1272, 1274, cert den 423 US 937, supra; People v Devine, 80 Misc 2d 641, 644).
The guidelines expressed by the majority signal the common, if not certain, locking of the courtroom door virtually whenever requested in pretrial hearings. To allow closure on the mere showing that press commentary would "threaten” the impaneling of an impartial jury (p 380) affords almost no protection to First Amendment rights for the simple reason that in cases of notoriety it will always be possible to show some risk of prejudice. Of greater concern, however, is that the majority has turned the burden of proof around. In Nebraska Press Assn, v Stuart (427 US 539, supra), the Supreme Court commented that "[t]he record demonstrates, as the Nebraska courts held, that there was indeed a risk that pretrial news accounts, true or false, would have some adverse impact on the attitudes of those who might be called as jurors” (427 US, at pp 568-569 [emphasis added]). Nevertheless, the court concluded that a sufficient showing had not been made that "alternatives to a prior restraint on petitioners would not have sufficiently mitigated the adverse effects of pretrial publicity so as to make prior restraint unnecessary” (at p 569). In so determining, however, the court reasoned that "our conclusion is not simply a result of assessing the adequacy of the showing made in this case; it results in part from the problems inherent in meeting the heavy burden of demonstrating, in advance of trial, that without prior restraint a fair trial will be denied” (at p 569). In contrast, the majority here instead of demanding a heavy burden of showing that alternatives to closure cannot insure a fair trial, requires a determination of the "magnitude of any genuine public interest” (p 381). This presumes that the press should be excluded and discourages use of alternatives to closing the courtroom. In effect, this procedure suggests that any pretrial publicity automatically produces an unfair trial—a proposition expressly rejected by the Supreme Court (see 427 US, at p 565).
By acceding to defendants’ motion for closure in this instance, the County Court exceeded its very limited power to exclude the press and public and overlooked a clear command *387 to preserve the right to a fair trial at a less drastic cost than shutting off channels of legitimate public information. Although the right of the defendant to a jury unbiased by the determination at the Huntley hearing has been repeatedly recognized in the courts (e.g., Lego v Twomey, 404 US 477, 483-486; Pinto v Pierce, 389 US 31; Jackson v Denno, 378 US 368; People v Huntley, 15 NY2d 72; People v Hulett, 28 AD2d .624, affd 22 NY2d 696, cert den 393 US 1097; People v Brainard, 56 AD2d 633; People v Higgins, 28 AD2d 1016; People v Cornell, 28 AD2d 1166; People v Pratt, 27 AD2d 199) here County Court dictated a draconian measure without proof of abject necessity. Before resorting to this ultimate restriction, the trial court was obliged to exercise "ability and ingenuity * * * to devise appropriate steps, within constitutional limits, to protect a defendant in his right to a fair trial” (Matter of New York Times Co. v Starkey, 51 AD2d 60, 66 [concurring opn, Shapiro, J.; emphasis added]; see, also, Matter of Hearst Corp. v Cholakis, 54 AD2d 592, 593). Mere threatened prejudice cannot be a basis for the court’s indulgence in a self-executing order which prevents the free flow of vital information to a willing public when the interests of the defendant in a fair trial, untainted by a juror’s knowledge of inadmissible evidence, can be preserved through the traditional means of detecting, identifying and dispelling prejudice through mechanisms which the law has created and which do t-not impede the flow of information. Unless the party demanding the invocation of the extraordinary practice of excluding the public at large can demonstrate that the effective employment of the time-tested methods—venire, continuance, instructions, admonitions to witnesses, and parties and counsel, sequestration of the jury, or change of venue—would be to no avail in the neutralization of potential sources of prejudice, the courts should not deprive the public of the vital function of the press nor abridge the fundamental interests protected by the First Amendment (Nebraska Press Assn, v Stuart, 427 US 539, 569, supra; see, also, concurring opn of Mr. Justice Powell, at p 571; Branzburg v Hayes, 408 US 665, 685; Sheppard v Maxwell, 384 US 333, 362-363).
It is no answer to suggest that the right to a public trial is waivable at the option of the accused. As the right of a public trial knows no correlative right to a private one (see Singer v - United States, 380 US 24, 34-35; Cook, Constitutional Rights of the Accused: Trial Rights, § 103), such a waiver cannot *388 automatically close the court. "A trial is a public event. What transpires in the court room is public property * * * There is no special perquisite of the judiciary which enables it * * * to suppress, edit, or censor events which transpire * * * before it” (Craig v Harney, 331 US 367, 374).
Accordingly, the judgment of the Appellate Division should be affirmed.
Chief Judge Breitel and Judges Jasen and Jones concur' with Judge Wachtler; Judge Cooke dissents and votes to affirm in a separate opinion in which Judge Fuchsberg concurs; Judge Gabrielli taking no part.
Judgment modified, without costs, in accordance with the opinion herein and, as so modified, affirmed.